Theresa J. STE. MARIE, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

EASTERN RAILROAD ASSOCIATION and Traffic Executive Association, Defendants.

No. 75 Civ. 4736 (RLC).

United States District Court, S. D. New York.

Oct. 16, 1978.

**1150**

Sue Wimmershoff-Caplan, New York City, for plaintiffs.

Conboy, Hewitt, O'Brien & Boardman, New York City, for defendants by Myron D. Cohen, David Rees Davies, New York City, of counsel.

ROBERT L. CARTER, District Judge.

## OPINION

### The Underlying Charge

In August, 1974, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") accusing defendant, Eastern Railroad Association ("ERA"), of maintaining policies and practices that discriminated against her as a female employee because of her sex. The charge cited two acts of alleged sex discrimination—(1) the refusal in May, 1974 to allow plaintiff to enroll in evening accounting courses under the company's tuition refund program and (2) ERA's failure or refusal to act favorably on plaintiff's application of June 18, 1974, for appointment to the position of Manager, Freight Department. EEOC referred the charge to the New York State Division on Human Rights. That agency issued its determination on October 24, 1974, finding a lack of probable cause and ordering the complaint dismissed. Plaintiff appealed, and on May 16, 1975, the State Human Rights Appeal Board affirmed dismissal of the complaint.

### Complaint and Class Determination

On June 30, 1975, EEOC issued its right to sue letter, and on September 26, 1975, plaintiff filed the instant complaint on behalf of herself and all other female employees who allegedly are being victimized by unfair employment practices in re the terms and conditions of employment of the ERA in violation of 42 U.S.C. § 2000e *et seq.* Plaintiff moved to certify the class to include all of defendant's [1] female employees. Defendant opposed the motion for certification of the proposed class of all female employees on the ground that plaintiff, for a variety of reasons, could not adequately represent a class so broadly defined. Defendant's arguments were rejected, and on October 20, 1976, the court ordered the class certified under Rule 23(b)(2), F.R.Civ.P., and the class as certified was defined as all female employees of the defendant organization. In her case here, plaintiff seeks an injunction prohibiting defendant from continuing the practices alleged to violate Title VII, 42 U.S.C. § 2000e–2(a) and (b) [2], a declaratory judgment that such practices contravene the above cited provisions, damages and attorney fees. The matter was tried before the court between January 31 and February 10, 1978. On the second day of the trial, the parties agreed to limit the trial to issues of liability only. Subsequently, proposed findings of fact, conclusions of law and post-trial memoranda were submitted.

### Overall Organizational Structure of Eastern Railroad Association

ERA is an unincorporated association which the 23 major railroads in the eastern

---

1. Plaintiff has named both the ERA and Traffic Executive Association (TEA) as defendants. Since the ERA is the umbrella organization over all the constituent departments or services involved—TEA, Railroad Perishable Inspection Agency (RPIA), Eastern Weighing and Inspection Bureau (EWIB)—we will refer throughout to defendant as if only ERA was named.

2. 42 U.S.C. § 2000e–2 provides:
 "(a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

part of the United States established on November 1, 1970, to provide administrative services and supervision of the Traffic Executive Association ("TEA"), the Eastern Weighing and Inspection Bureau ("EWIB") and the Railroad Perishable Inspection Agency ("RPIA"). Overall administration of ERA is performed by two administrative committees, composed of representatives of the member lines, and day to day executive supervision and administration of ERA rests with Charles L. Smith, President of ERA and Chairman of TEA.

## TEA

TEA, functioning since 1877, deals with rates, classifications, allowances and charges. Within TEA is the General Freight Traffic Department (GFTD). This department analyzes rate proposals and recommends to ERA member lines whether to approve or disapprove their adoption. It is the largest department within TEA and offers its employees opportunity for acquiring technical skills in the handling of transportation and traffic problems. There are technical positions in the department (junior, intermediate and senior rate clerk) for which attendance at Advanced Traffic School is considered desirable, and advancement to the upper echelons of the ERA and TEA is said to require experience and knowledge as a rate clerk. Not an inconsiderable number of those now holding exalted positions in the organization, however, were not required to attain their present eminence on the junior, intermediate, senior rate clerk escalator, and a number of defendant's executives did not attend Advanced Traffic School or, if enrolled, did not complete the course.

Publication Services is the second largest department in TEA. It has two main divisions—a Tariff Services Bureau and a Data Processing Center. The Tariff Services Bureau compiles, publishes and files with the appropriate government agency rates, rules and regulations for the member lines. The Data Processing Center provides data processing and computer programming for ERA and member lines. As with GFTD, normal lines of progression seem clear through intermediate technical positions, e.g., junior, intermediate, and senior tariff compiler; key input operator, supervisor, key input section, console operator, programmer (junior, intermediate, senior), and systems programmer, but thereafter the steps upward are not so precisely outlined.

It had long been TEA's policy to encourage all male employees in GFTD to attend Advanced Traffic School, and to further this policy a tuition refund program was adopted. Under that program 50% of tuition costs of those attending Advanced Traffic School was paid on enrollment, with the balance of the tuition being reimbursed on satisfactory completion of the course and employment at TEA continuously for 6 months thereafter. Until recently, no such encouragement and assistance were given to female employees, and indeed, women were not employed as rate clerks until approximately 1972. There was testimony that Joseph Liebscher, a long time employee of TEA and currently ERA's Comptroller who interviews new hirees, did not acquaint female employees with the tuition refund program or indicate to them the desirability of attending Advanced Traffic School. There was also testimony that David Rogers, Director, Publications Services and Tariff Publishing Officer, actively encouraged all tariff compilers to attend Advanced Traffic School and those in data processing to improve their knowledge by attending an IBM institute or university such as New York University offering courses in computer science technology. The tuition refund program has been expanded to include the latter programs. Indeed, it is fair to say that the current program embraces any continuing educational curriculum that would render the employee more useful to the ERA. While Liebscher should be more conscientious in providing information to new employees about the organization's policy, the program as currently administered is free of any taint of discrimination, and all female employees know about the program or have ready access to such knowledge.

*Administration and General Services*

The Administration and General Services Department performs general personnel and housekeeping functions for all units of the ERA. It maintains personnel records, handles payroll, payroll taxes, and administers employee benefit and health plans. Its chief officer is the comptroller.

*Eastern Weighing and Inspection Bureau ("EWIB")*

This organization polices weight agreements between railroads and shippers, investigates loss and damage claims and provides various inspection and loading services in connection with railroad cars. Until 1970, EWIB was a constituent part of TEA, but with the formation of ERA that year, EWIB was placed directly under the jurisdiction of that agency subject to the immediate supervision of the Inspection Services Department. A majority of the employees in EWIB are inspectors. There are various district offices located throughout the geographical area in which member lines of the ERA operate and from which the inspectors work. These offices are headed by district managers. Promotion to district manager is made by the general manager of the Inspection Services Department, subject to the approval of the President of ERA. A director of EWIB is appointed with the approval of the President of ERA.

*Railroad Perishable Inspection Agency ("RPIA")*

This agency became a part of ERA in 1970. It performs inspection and loading services, investigates loss and damage claims in respect of perishable commodities, i. e., vegetables, meats and frozen foods. The principal job category here, as in EWIB, is inspector. It operates district offices in some 32 cities. When the agency began functioning in the 1930's, no formal educational qualifications were needed for employment. Since 1940, an RPIA inspector is required to have a minimum of 2 years college in agriculture, biology or bacteriology. This is the only defendant agency which mandates precise educational requirements as a condition of employment.[3] A district inspector heads each district office, a district manager is responsible for each home district, and a regional manager heads each region. There is a director and manager of RPIA. Both are appointed on the recommendation of the President of ERA.

RPIA is the only ERA constituent to be governed by a collective bargaining agreement. The agreement requires that all but excepted positions must be bulletined before they can be filled. The excepted positions—director, manager, district inspector, assistant district inspector, chief clerk, assistant accountant, three office managers, dry freight inspectors and secretaries employed at ERA headquarters, Two Penn Plaza in New York—need not be bulletined. Appointments to these excepted positions (other than director and manager) are made on the recommendation of the general manager, Inspection Services Department. However, except for the director and manager, the rates of pay and all other terms and conditions of employment of the excepted positions are governed by the collective bargaining agreement between RPIA and the Brotherhood of Railway, Air Line and Steamship Clerks.

An Inspection Services Department has overall supervision of both EWIB and RPIA. This agency came into being on May 17, 1974, and is headed by a general manager.

*Top Management*

All top key management positions are appointed by Administrative Committees of TEA and RPIA on the recommendation of the President, ERA and Chairman, TEA, both positions now held by Charles L. Smith. These positions include Chairman and Vice Chairman, TEA; Chairman and Vice Chairman, General Traffic Freight

___

3. There are two dry freight inspectors and coopers. No background in agricultural science is necessary for appointment to these positions.

Committee; Director, Publication Services and Tariff Publishing Officer; General Manager, Inspection Services; Comptroller; Director and Manager, EWIB; and Director and Manager, RPIA.

*ERA's Policy of Job Qualifications*

Except for the indicated RPIA positions, there are no educational requirements for any position in the organization. Many of those holding top positions are self-made men who rose through the ranks. While the President of ERA and Chairman of TEA, Charles L. Smith, is a college graduate, his fellow high ranking colleagues seem not to possess a college education.

Defendant contends that rate experience is a *sine qua non* for advancement to the higher reaches of TEA, and that, therefore, advancement must include tenure on the rate clerk ladder and attendance at Advanced Traffic School. I reject this contention as unproved. Since a major function of the organization concerns rates, some background and knowledge of this feature of defendant's operation is certainly needed for advancement to top management positions, but it is clear that such background knowledge can be gained without service on the rate clerk gradation.

As indicated earlier, some of the top men seem to have gained eminence in the organization without experience as rate clerks. The present Comptroller, Joseph Leibscher, came up through the ranks from office boy and became Member, Research Group without having spent time as rate clerk. Rather, by diligent application to his assigned duties, Liebscher apparently earned the respect of his supervisors. As he advanced upward on their recommendations, he amassed sufficient knowledge of the organization's functioning to enable him to take on added responsibilities.

Nor is the present Tariff Publications Officer one who has had a rate clerk background. David Rogers gained his knowledge about rates and rate making in his former position with the Interstate Commerce Commission. Gloria Endriss, who was appointed in 1977 as a Member, Research Group—the first woman to hold that position—has no rate clerk background. There are others as well, but further detail is unnecessary. On the basis of this record, defendant has failed to establish that the absence of women from top management positions is due to a lack of experience and training as rate clerks—a lack of training for which defendant's policies are directly responsible in any event.

Defendant may be on sounder footing in its contention that upward mobility in the inspection services departments (EWIB and RPIA) must begin with some experience as an inspector. This seems plausible enough. There is a paucity of female inspectors, however—one in EWIB where no specific educational background is required, and two in RPIA where 2 years in agricultural college is necessary. Defendant's justification for having so few women inspectors is set forth in a subsequent section of this opinion.

*Defendant's EEOC Reports for 1974, 1975, 1976, 1977*

Introduced into evidence were defendant's yearly reports to EEOC. In its 1974 report, it listed a total work force of 579 persons—469 men and 110 women. 97 of its employees were classified as officials and managers, and all were men.

The 1975 report shows 562 employees—450 men and 112 women; 100 employees are classified as professional and all are men; 69 are listed as technicians—2 women and 67 men; 234 are reported as office and clerical employees—124 men and 110 women; and 92 are classified as officials and managers and again all are men.

In 1976 a total work force of 566 employees is reported—445 men and 121 women; 99 are listed as professionals—98 men and 1 woman; 31 are listed as technicians—12 women and 19 men; 225 are classified as office and clerical—115 women and 110 men; 109 are called officials and managers—106 men and 3 women. One of the three women so listed in this category is Josephine Zangel, executive secretary to TEA.

Prior to this report, her position was listed among office and clerical personnel. In 1976 it was decided to reclassify her job as an executive position since Ms. Zangel had assumed added responsibilities. The other two women are Gloria Simoncini and Helen Furness, RPIA office managers in district offices in Philadelphia and Boston respectively.

The 1977 report records 524 total employees—405 men and 119 women; 90 are classified as professionals—89 men and 1 woman; 90 are listed as technicians—84 men and 6 women; 214 are office and clerical—105 men and 109 women; and 94 are listed as officials and managers—91 men and the 3 women referred to above.

*Executive Positions*

Defendant introduced an exhibit showing some 34 positions which defendant represented as executive. That list has remained constant since February, 1974 with the following exceptions: F. H. Hendrell retired in 1977 as Director, EWIB and R. A. Clark was promoted to that position. W. H. Smithers succeeded Clark as Manager, EWIB; B. M. Oliver was made General Manager, Inspection Services Department; R. P. Tomasulo was appointed Manager, GFTD; T. C. Monaghan was made Member, Research Group; Gloria Endriss succeeded J. J. Hill as Member, Research Group in January, 1977; Josephine Zangel's position of Executive Secretary was designated an executive one; and O. F. Scottinger, Assistant Manager Tariff Services, had been demoted and at the time of trial that position had not been filled.

The positions designated as executive ones are President, ERA and Chairman, TEA; Vice Chairman, TEA; Chairman, GFTC; General Manager, Inspection Services; Director, Publication Services; Comptroller; Director, RPIA; Director, EWIB; Assistant to Chairman, GFTC; Director, Systems Planning; Manager, Data Processing; Manager, Motor Carrier Bureau; Manager, Commerce and International Division Bureau; Manager, Statistical Records; Manager, RPIA; Manager, EWIB; Secretary, ERA and TEA; Manager, Executive Department; Manager, Tariff Reissue Section; Member (5) Research Group; Director, Damage Prevention Services; Assistant Comptroller; Assistant Chairman, Coal, Coke, Iron Ore Committee; Manager, Employee Benefits; Tariff Publishing Officer; Manager, Freight; Accountant, Payroll and Taxes; Assistant Manager, Tariff Services; Chief Clerk; Executive Secretary.

As of February, 1974 only 33 of these positions would have been designated as executive ones since Executive Secretary during that period was classified among office and clerical personnel, and all were men. Since 1974, a position held by a woman was added to the executive position and a woman was named to an executive vacancy. At trial, there were 32 men and 2 women in what defendants designated as executive positions.

There are, of course, other managerial positions below these 34 executive positions in which vacancies were filled subsequent to February 2, 1974. Those include Accountant, Payroll and Taxes to which John O'Connell was appointed in July, 1974; Manager, Motor Carrier Bureau to which H. J. Mangelli was appointed on May 31, 1974; Tariff Publishing Officer to which J. F. Doyle was appointed on May 31, 1974; 5 District Managers, EWIB were appointed in 1974 and 3 since that date; in the RPIA several Regional Managers, District Managers, District Inspectors and Assistant District Inspectors have been appointed in and since 1974.

*Procedure for Filling Vacancies*

Vacancies in managerial and executive positions listed above are not posted, although there was an apparent departure from this procedure in respect of Manager, GFTD when that position became vacant in 1974. Appointments are usually made to an executive position within a department on the recommendation of the head of that department. Department heads are selected on the recommendation of ERA's President. Until the spring of 1977, there were

no written job descriptions for the 34 executive positions, but such descriptions have now been completed. Positions below the managerial level in the TEA are now bulletined; that is, the job description and qualification prerequisites are written up by each department head, and this along with notice of the vacancy is publicized on the bulletin board in the New York office. No professional assistance in this respect is sought, and no department head or other ERA employee was presented who had training in job analysis. Thus, the job descriptions are ad hoc and homemade. After the vacancy is publicized, applications are accepted. The procedures thereafter are not uniform. For Manager, Freight Department, the candidates were orally interviewed, asked questions and scored. Not every candidate was asked the same questions; and the answers of the winning candidate were not scored. Bolch, Chairman, GFTD, who had structured the test and written up the job qualifications, indicated that the interview was very important for those people outside his department. He knew the personnel in his own department so the interview with the job applicant was more important for those whom he did not know. He testified that he evaluates applicants on prior experience, work in their present position and attendance record.

In data processing one of the bulletined jobs was that of systems programmer. The qualifications written up for this position called for 3 years assembler language coder experience, and listed as desirable but not required were a B.A. or B.S. and a certificate from a recognized IBM computer science institute. The minimum of three years assembler language coding experience was regarded as essential because the "most important applications are freight rate tariffs" written in assembler language. The formal education requirements, however,

were not regarded as mandatory. The testimony showed that only two people in data processing met or nearly met these requirements—a man and a woman. Neither had a college degree, although both had some college credits. The woman had a few months less experience in assembler language coding than the man and had a certificate in computer science from New York University, while the man had a certificate from an IBM computer science school. There were no tests given, and the man was chosen. The woman candidate testified that she thought the job description had been written-up especially for the successful male since only two people in the organization could come close to having the qualifications for the position. Rogers, the department head, testified that he did not know that only two people could possibly have qualified when the job description was written, but I cannot credit that disclaimer.[4]

Until 1971, except for positions covered by the collective bargaining agreement with RPIA employees, no vacancies were publicized or posted. In 1970 Elizabeth Ekerson, an employee with long tenure in TEA, filed a Title VII charge with EEOC accusing TEA of gender-based discrimination. The charge was referred to the New York State Human Rights Commission. The latter secured defendant's adherence to a conciliation agreement pursuant to which defendant promised to refrain from any acts of sex discrimination in the future, to promote women to management and executive positions, to expand its recruitment of female employees, to issue a written directive to all employees affirming an equal opportunity promotion policy and announcing that notices of all future employment and promotional opportunities would be given to all of its employees. The Commis-

---

4. A similar complaint has been voiced in connection with a posted vacancy—Assistant Member Research Group—a position which has since been abolished. Elizabeth Ekerson applied for the position. In her letter of application Ekerson stated that she still chose to apply "even though the stipulated condition of 'familiarity with both rates and Fourth Section

matters' is so new and unique that it embraces only one particular male employee. As outlined, none of the present members and assistant members could qualify for the position." (See Pl. Ex. 88). The Ekerson memorandum is not dated but I assume it was written prior to the date she filed her EEOC charge in 1970.

sion's determination and order embodying the terms of the conciliation agreement was entered on October 12, 1972. Since 1972 notices of vacancies in various job categories, but not embracing top management, have been posted but apparently, except for notices required by union contract for RPIA vacancies, only at New York headquarters.

There are no written criteria governing the department head's determination to hire or promote. The factors which the chief executive officer of ERA considered controlling in this regard were: the applicant's education and previous experience; knowledge of the current job and performance; leadership potential; emotional stability and relationship with co-workers; attitude towards job and ability to take supervision; absenteeism; ability to make logical decisions in an objective manner; creativity and ability to perform without close supervision; loyalty to the organization and ability to perform assigned tasks consistently with the organization's policies and practices; and manner and appearance.

These are, of course, highly subjective and imprecise criteria subject to greatly fluctuating evaluations based upon the background and personality of the evaluator and the chemistry which develops in the interaction with the applicant.

*The Statistical Evidence*

Plaintiff's statistical expert was a Professor David Levine, Chairman of the Department of Statistics at Bernard Baruch College. Plaintiff sought to show through Professor Levine that defendant discriminated against its female employees in salary and promotions. Defendant criticized Professor Levine's statistics because of the inclusion of RPIA in data predating 1970 since RPIA became a part of ERA only as of November, 1970. Professor Levine agreed to eliminate from consideration all data relating to RPIA predating 1970.

The statistical showings primarily demonstrated defendant's almost exclusively male executive and managerial hierarchy. There is no evidence of any salary disparities between men and women occupying the same position. The gap between male and female employees in salary and salary expectations demonstrated by the statistical data occurs because up to now women have been excluded from top ranking management positions, where the pay is $20,000 per annum and above.

The primary focus, therefore, is on the data regarding job classification. There may be minor errors in the overall totals, e.g., at one point an intermediate rate clerk was included among the clericals in the statistical data instead of as a technician. Nevertheless, the classifications were taken from defendant's records. Plaintiff is surely entitled to rely on defendant's description and classification of its own employees. At any rate, the disparities appear to be too gross for one erroneously placed statistic to alter the basic statistical profile to any appreciable degree.

Employment data for January, 1977 show 118 females (or 21.9%) and 420 males (78.1%) in defendant's total work force; 77 women (14.3% of the total work force and just short of ⅔ of all women employees) held clerical positions, while 24 men (or 4.5% of the total work force and approximately 5.5% of the men) held clerical jobs; 38 women (7.1% of the work force and roughly ⅓ of all female employees) held technical positions, while 323 men (60% of the total work force and approximately 75% of the men) were employed as technicians; 3 women were at management level (or 0.6% of the total work force and less than 2% of the women), while 73 men (13.6% of the total work force and 17.5% of the men) held management positions.

Data as of January, 1975 revealed substantially the same picture. There were 116 females (21%) and 436 males (79%) in the total work force; 80 females (14.5% of the work force and approximately 68% of the women) held clerical positions, while only 31 men (5.6% of the work force and approximately 7% of the men) were listed in that category; 35 women (6.3% of the total work force and a bit more than 30% of women) held technical positions, while 331 men (60% of the total work force and

roughly 70% of the men) were classified as technicians; one woman was listed in management (0.2% of the work force and less than 1% of women) while 74 men (13.4% of the work force and 17% men) held managerial positions.

Based upon women constituting 21.9% and men constituting 78.1% of the total work force in 1977, Dr. Levine testified that normal expectations would be for these percentages of men and women to be mirrored more or less across the board in the defendant's broad job categories—clerical, technical, managerial. That is, based on 1977 totals, you would expect to find 21.9% or 16 or 17 women and 78.1% or 59 or 60 men occupying the 76 listed managerial posts; 79 or 80 women and 281 or 282 men occupying the 361 technical positions; and 22 or 23 women and 79 or 80 men occupying the 101 clerical positions. Instead of 16 or 17 women at management level in 1977, we find only 3; instead of 79 or 80 women technicians in 1977, we find only 38; and instead of 22 or 23 female clerks, we find 77. That difference expressed in terms of standard deviations is 4.09 at the managerial level, 9.13 in technical positions and 14.50 at the clerical level. In short, women fell below the expected rates at the managerial and technical levels by 4.05 and 9.13 standard deviations respectively, and exceeded the expected or normal distribution at the clerical level by 14.50 standard deviations.

Similar equations were given for 1975. At that time women were 21% and men 79% of the total work force. Under normal circumstances, all things being equal, one would anticipate a 21% to 79% distribution throughout defendant's various broad categories; i. e., 15 or 16 women and 59 or 60 men in the 75 management posts; 76 or 77 women and 289 or 290 men in the 366 technical positions; and 23 or 24 women and 87 or 88 men in the 111 clerical posts. Instead there was only 1 woman in management, only 35 women in technical positions, and over 80 female clerks. This difference between the expected number of women and the actual number, expressed in standard deviation units is 4.50 standard deviations at the management level, 9.26 standard deviations in re technical positions, and 14.64 standard deviations at the clerical level. In management and technical positions the difference between the expected and the actual number of women fell below the mean and would be expressed as minus 4.50 and 9.26 standard deviations, while the difference between the expected and the actual numbers in clerical positions was above the mean and would be expressed as plus 14.64 standard deviations.

### The Testimony of Individual Members of the Class [5]

There was testimony that Liebscher had not advised new hirees about the tuition refund program. There was also testimony that women were working in technical positions in the freight department, data processing center and tariff services bureau. Pamela Tremble applied for the job of EWIB inspector in Detroit in 1974 when the current district manager took over. She had had outside experience in transportation and shipping. Her application was mailed to New York. No other application before or since has been sent to New York for approval. A man outside the organization whose prior experience had been that of a gasoline station attendant was hired.

Eileen Constanza applied for the position of EWIB inspector in or about the fall of 1975 (2½ years before trial). R. A. Clark advised one of the female secretaries that Constanza's sex disqualified her for the job, and women during that period had been advised they would not be allowed to attend Advanced Traffic School.

Nancy Di Grisi and the plaintiff applied for the position of Manager, Freight Department when the job was posted in 1974. De Grisi submitted to the interview but Ste. Marie refused to participate because she was not allowed to bring someone to the interview with her so that she could have

---

5. Some of this testimony has been set out in other sections of this opinion.

some independent proof that she had answered the questions correctly.[6]

There is no dispute that female employees are now being hired in technical jobs and are allowed to advance, at least up to a point. The morale of the women seemed low, however. One of the most impressive witnesses was a Ms. Leslie Paul who is a senior section compiler in the Tariff Services Bureau, the first woman to hold that position. She testified that all traffic compilers who are not highly rated are assigned to her section, and she feels the organization is not giving her proper support, although convinced her immediate boss, Rogers, would not discriminate against women.

Nancy Mathews testified that she had been junior and intermediate rate clerk and in 1974 was attending Advanced Traffic School but had not completed the course when senior rate clerk openings occurred. The two men chosen had not finished traffic school either, and both had less seniority than she. In 1975, a senior rate clerk position opened up and she was appointed. She is now acting as chief clerk because the regular chief clerk is on special assignment.

*Defendant's Evidence ·*

Based on interviews with students in agricultural colleges since 1964 in the New England area and since 1973 in the New York-New Jersey area, Jed A. Coggins and William Van Keuren, RPIA regional managers, testified that few women are interested in inspector jobs in RPIA. No testimony was introduced as to the number or percentage of females in agricultural colleges before or since 1974.

Moreover, as further reason for having so few female inspectors it was said that the inspector's job in both RPIA and EWIB is physically difficult and unattractive, requiring considerable exertion and on site inspec-

tions at unpleasant locales; that all entry level inspectors would get the most unattractive assignments; and that often these assignments require early morning or late at night inspections at urban sites in crime prone locations. Coggins testified that he successfully recruited 2 women as RPIA inspectors and that one was hired in 1977 and another in 1978. There are, as indicated previously, no educational qualifications for EWIB inspector.

There was testimony that a defined line of progression existed for advancement in the organization, but this testimony was refuted by actual experience of a variety of executives. Men like Liebscher and Bolch came up through the ranks and were given an opportunity to acquire knowledge and skill through experience on the job. Women were not.

Defendant presented testimony to establish that Ste. Marie had personality problems, and had made a public display of disloyalty to ERA. She was said to have a take charge personality, and took on more than she should have. Her conduct was characterized as abrasive and at times offensive to fellow employees. Moreover she had a high absentee record and left work early, but apparently her hours were fixed with the consent of her superior. She is obviously a strong and opinionated woman, but defendant has kept her on the job for years. She has made suggestions from time to time which her superiors thought sufficiently creative to accept and act upon. Moreover, none of defendant's employees who worked under Ste. Marie supported defendant's characterizations. Indeed, the testimony of the women emphasized plaintiff's fund of knowledge and willingness to help fellow employees.

Defendant urged that only statistics relating solely to the TEA office in New York

6. During the trial the court announced that the plaintiff's refusal to take the test invalidated her claim of discrimination in not being selected. *See Patmon v. Van Dorn Company Plastic Machinery Division,* 498 F.2d 544, 546 (6th Cir. 1974) (per curiam). In view of my conclusion as to the lack of fundamental fairness in the administration of the test and the total and

unabridged subjectivity of the process, the propriety of that announcement from the bench is open to question. However, since we are now dealing solely with disparate treatment of the class, resolution of that question can be postponed until the issue of individual damages is reached.

were relevant to our inquiry. These were said to give the fairest picture because EWIB and RPIA offices were widely dispersed and most of the jobs in EWIB and RPIA are those of inspectors. In January, 1977, the total work force in RPIA was 167 males and 22 females. Of that total, 96 (69.8%) were inspectors and 33 were coopers, constituting 87.3% of RPIA's total work force. The remainder were 36 regional and district managers, 17 women secretaries, 5 miscellaneous clerks and 1 male stenographer. EWIB has a total of 145 employees, 83 inspectors, 11 district or assistant district inspectors (64.8% of total work force); of 25 women, 18 were secretaries.

The thesis of Thomas Budne, defendant's statistician, was that statistical analysis should be confined to the TEA's 161 New York employees because New York was the "only area where there were opportunities for all people for all jobs, if they chose to bid for them." (R 1569). Budne advised the court that Rogers was not included in the data confined to New York because he was initially hired as an executive. In another calculation all persons hired as secretary, stenographer or typist are excluded. Budne cited data in the 1977 Census Report to the effect that 98.5% of the nation's secretarial population was female. At another point Budne sought to show that all male executives above the $400 salary level had seniority dating back to 1961 or earlier, but 4 males, Rogers, Byrne, Nappi and McGirr would not fit the profile. Budne excluded Rogers as in the previous example, and the other three were explained away because of their "extraordinary background"—23 years prior railroad experience for Byrne, costing background for Nappi and 10 years railroad administrative experience for McGirr.

*Discussion*

The EEOC charge on which this case is based was filed on August 2, 1974. There the plaintiff alleged that defendant had discriminated against her in the administration of its tuition refund program and in rejecting her in favor of a less qualified male to fill the vacant post of Manager in the freight department. She asserted that had she been a man she would have been found qualified to participate in the tuition refund program and would have been selected for the freight department position. She charged defendant with employment discrimination because of her sex.

Litigation was instituted here as a class action. Plaintiff is suing on her own behalf and on behalf of all female employees who allegedly have been victimized in the terms and conditions of employment by defendant's gender based discriminatory policies and practices. While the parameters of a Title VII case in the district court are generally defined by the originating charge and the agency investigation that can reasonably be expected to grow out of those allegations, *Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678 (5th Cir. 1975); *Hubbard v. Rubbermaid, Inc.*, 436 F.Supp. 1184 (D.Md.1977), the court controversy may encompass any kind of discrimination related to the allegations contained in the charge. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465–66 (5th Cir. 1970). Here the unfair employment practices complained of consisted of "patterns and practices against . . . female employees, in all areas of employment, including but not limited to compensation, advancement opportunities and fringe benefits" (complaint, par. 11) and confining women to clerical classification. While it is conceded that defendants exhibit a "less discriminatory attitude towards some relatively new female employees," the defendants were charged with particularized discrimination against "experienced, senior female employees who are now long overdue for promotion above the clerical level, to executive and managerial positions." (complaint, par. lli). These allegations are the logical extensions of the basic charge, *see Sanchez v. Standard Brands, Inc., supra*, and are like or encompassed therein, in that the charge, fairly read, accuses the defendant of maintaining overall patterns and practices of gender based discrimination in respect of the conditions and privileges of employment.

 Since by stipulation the parties have limited for the present the issues to questions of liability, we are at what has been designated Stage I of a Title VII trial. See *United States v. United States Steel Corp.*, 520 F.2d 1043, 1053 (5th Cir. 1975), cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976). At this stage, the focus is on the "defendant's broad employment policies and practices, the defendant's rebuttal and business necessity defenses, and the inferences which remain at the close of the evidence." No issue of damages is involved at this stage of the proceedings, and the class must establish that the employer's practices resulted in deprivations to it as a class. If it is determined that invidious discrimination has been leveled at the class, proof of individual deprivation may be subsequently established. *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437 (5th Cir.), cert. denied 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 46 (1974). At this point in the proceedings, therefore, focus must be on injury to the class, rather than injury to the individual, and the class representative need not establish that she was personally victimized by discrimination, *Abron v. Black & Decker Mfg. Co.*, 439 F.Supp. 1095 (D.Md. 1977). Indeed, even though the claim of the class representative may fail, that does not mean that the class is necessarily deprived of remedy. *See Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377, 1380 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972).

 The overriding purpose of Title VII is to require employers to make job related decisions about each employee based upon his or her relevant individual characteristics, so as to render the employee's social, ethnic, sexual or religious identification irrelevant. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Plaintiff is asserting that the alleged disparate treatment to which defendant subjects its female employees frustrates the purposes of the Act. Being a disparate treatment rather than a disparate impact case, *see Griggs v. Duke Power Co., supra; Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), proof of purposefulness is critical, *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); and plaintiff has the burden of establishing a prima facie case. *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 425, 95 S.Ct. 2362; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In her effort to fulfill that obligation, plaintiff has presented evidence of sex discrimination in the employment practices of TEA dating back to 1965; she has relied heavily on statistical data to establish current sex discrimination practices throughout ERA; has attacked the current policy of job posting and testing as inadequate and as perpetuating past discrimination into the present; and has sought to show through the testimony of individual members that sex discrimination against female employees is no isolated incident but a consistent pattern of conduct.

The evidence shows that until well after 1970, the defendant hired women solely to fill clerical positions and that female employees were not hired as rate clerks or trained for responsibility in technical areas. No woman was permitted to participate in defendant's tuition refund program, and none were encouraged to attend Advanced Traffic School where they could have acquired basic technical skills to speed their advancement in the organization or to facilitate entry to other traffic or transportation organizations. Prior to 1972, job vacancies were not bulletined or generally advertised to the employees, except for those jobs governed by the union contract in RPIA.

Vacancies were filled within a department solely on the recommendation of the department head. Vacancies at the level of department head and beyond were filled on the recommendation of the organization's chief executive. No job descriptions or job analysis were used. No written guidelines or objective criteria were applied in the promotion decision making process. Promotion was based on the ad hoc subjective

judgment of the appointing authority that a particular male employee had the necessary qualifications needed to fill the vacancy or to take on a new assignment.

Joseph Liebscher and William Bolch typify how the system worked. Both started as office boys, Liebscher in 1934, Bolch in 1944. Each advanced steadily through the ranks under the watchful eye and with the supportive help of his superiors. When a promotion was available, Liebscher would be asked by a superior if he was interested. He would indicate he was, and he would be appointed. The same practice obtained with Bolch. No competitive tests were given. While this procedure was in effect, women were not promoted to executive or managerial positions. These were the exclusive preserve of male employees. Indeed, no woman had broken into that male hierarchy until this suit was pending. Then Gloria Endriss in January, 1977 was made a member, Research Group and Josephine Zandel's position of Executive Secretary, heretofore classified as clerical, was upgraded to executive status.

█ It is clear that some of these past practices are no longer operative, and this case is limited to policies, practices and acts of discrimination occurring no more than 180 days prior to August 2, 1974, when the plaintiff's underlying charge was filed with the EEOC. Yet, policies which perpetuate past discrimination into the present, absent a clear showing of business necessity, violate Title VII. *See Rogers v. International Paper Co.*, 510 F.2d 1340, 1347 (8th Cir.) *vacated on other grounds*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29, *modified*, 526 F.2d 722 (1975). Consideration of defendant's past discriminatory practices, therefore, are relevant to determine whether current prophylactic steps have eliminated all vestiges of the former gender-based discrimination. Obviously, employment practices affecting supervisory or managerial personnel are not insulated from the pinch of Title VII enforcement, *Gilmore v. Kansas City Terminal Ry.*, 509 F.2d 48 (8th Cir. 1975), and in that connection, it must be pointed out that action taken in the face of litigation is gener-

ally regarded by courts as "equivocal in purpose, motive and permanence." *Jenkins v. United Gas Corp.*, 400 F.2d 28, 33 (5th Cir. 1968).

█ In 1972, based on a conciliation agreement in respect of a Title VII charge filed by Elizabeth Ekerson, a long time employee, defendant, without admitting any past violations of the law, agreed not to discriminate in the future, to recruit women and to promote them to executive positions. Pursuant to the conciliation agreement, the tuition refund program was opened to women, and women are now attending Advanced Traffic School. Job vacancies in TEA below the executive level are now bulletined, i. e., the department head drafts a statement of the qualifications needed for the position, posts that description on an employee bulletin board in the New York office, and accepts applications for the opening. There is no question that women are now hired in technical positions and are working as rate clerks at various levels in the freight department, as tariff compilers at all stages in the Tariff Services Bureau and as computer technicians in the Data Processing Center. The question, however, is not whether defendant has made and is making a good faith effort to comply with Title VII but whether this record shows practices which violate the Act. "In this sense, the question is whether the employer has done enough." *Rowe v. General Motors Corporation*, 457 F.2d 348, 355 (5th Cir. 1972).

Plaintiff points out that while some positions are advertised, the descriptions of needed qualifications are ad hoc, made solely on the basis of the views of the department head. The bulletin containing the job qualifications posted in 1974 for Manager, freight department, was drafted by Bolch without consultation with anyone else. The test devised to determine the winning candidate for that position again was a Bolch product not professionally developed, and the method of testing and evaluating the winning scores was highly subjective and somewhat bizarre. The candidates were not asked the same questions, and in some

instances the candidates' answers were not scored.

■ Homemade tests and tests not professionally developed are not acceptable on a challenge of Title VII violation. *See United States v. N. L. Industries*, 479 F.2d 354, 371 (8th Cir. 1973). Since promotion to managerial status and beyond cannot be left solely to objective criteria, subjective equations are not *per se* violations of Title VII, and are to be condemned only if discriminatory results follow. *Alexander v. Gardner-Denver Co.*, 519 F.2d 503 (10th Cir. 1975) *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). When subjective equations are used, however, they must be validated as being job related, *Rogers v. International Paper Co., supra*, and procedures for promotion and job assignment that are neither objective nor uniform are at the very least suspect. *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 232, n. 47 (5th Cir. 1974).

■ A selection process such as that currently employed by defendant fails to conform to Title VII requirements because it is totally discretionary and not guided by written instructions, *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 328 (5th Cir. 1977) *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); and because the choice depends almost *entirely* on the recommendation of the department head, without written instructions as to what qualifications warrant consideration, objective criteria or operative procedures to insure against discriminatory practices. *See Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1193 (5th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976) *quoting Rowe v. General Motors Corp., supra*, 459 F.2d at 358–59; *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975); *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976) *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). Upgrading that depends upon the employer's subjective opinion concerning various traits is said to subject the promotion to "the intolerable occurrence of conscious or unconscious prejudice." *Robinson v. Union*

*Carbide Corp.*, 538 F.2d 652, 662 (5th Cir. 1976), *modified*, 544 F.2d 1258, *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977). Moreover, the race or sex of those making the critical subjective evaluations has often been considered a pertinent factor in Title VII cases, *see, e. g., Stewart v. General Motors Corp., supra*, 542 F.2d at 450; *United States v. N. L. Industries*, 479 F.2d at 368, and female employees in this case are certainly warranted in being skeptical about expecting non-discriminatory treatment when promotion to managerial or executive status is dependent upon the decisive recommendations of males in an almost total male managerial hierarchy. *See Rowe v. General Motors, supra*, 457 F.2d at 359.

■■ Title VII is no guarantee of a job, *Patmon v. Van Dorn Co., Plastic Machinery Division*, 498 F.2d 544 (6th Cir. 1974), and the qualifications established for a specific position are the employer's prerogative. *Rowe v. General Motors, supra*, 457 F.2d at 348. Nor, where the employer demonstrates the weighing of each candidate's talent, is the choice of a qualified man over a qualified woman for a single opening gender based discrimination under the Act. *See e. g., Olson v. Philco-Ford*, 531 F.2d 474, 478 (10th Cir. 1976). Where, however, a permanent pattern of such selection occurs, where competency or capacity distinctions inhere "in the nature of an employee as a man or woman" or where culturally biased concepts of ability to perform because of sex play a part in the selection process, an infraction of Title VII occurs. *Pond v. Braniff Airways, Inc.*, 500 F.2d 161, 165–66 (5th Cir. 1974).

■ Since it is well recognized that specific acts of discrimination may be hard to come by in a disparate treatment case, reliance upon inferential proof of purposefulness is appropriate, *see Sweeney v. Keene State College*, 15 E.P.D. ¶ 8030 at p. 7099 (1st Cir. 1978). Plaintiff here has quite properly sought to structure a prima facie showing of sex discrimination on a foundation of statistical proof. Courts have come to regard statistical data as reliable indicia of patterns and practices in Title VII cases.

See e.g., Rogers v. International Paper Co., supra, 510 F.2d at 1345; Muller v. United States Steel Corp., 509 F.2d 923 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); Brown v. Gaston County Dyeing Machine Co., supra, 457 F.2d at 1382; United States v. Jacksonville Terminal Co., 451 F.2d 418, 442 (5th Cir. 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970). Indeed, gross statistical disparities alone may suffice to establish a violation of the Act. Dickerson v. United States Steel Corp., 439 F.Supp. 55, 64 (E.D.Pa.1977). A statistical showing of the underrepresentation of female employees, coupled with the absence of an established line of progression or bona fide seniority establishes a strong prima facie case of sex discrimination, thereby shifting the burden to the employer. James v. Stockham Valves and Fittings Co., supra, 559 F.2d at 348.

To paraphrase Mr. Justice Stewart in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the reason that the courts place reliance on statistics is because normal expectations are that non-discriminatory hiring practices will in time result in a work force more or less representative of the male and female composition of the community from which employees are hired. See also, Castenada v. Partida, 430 U.S. 482, 494 n. 13, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Plaintiff did not attempt to make a comparison of defendant's male-female work force with the male and female composition of the relevant labor pool in the geographic area from which defendant secures its labor supply. She has used a less stringent standard in measuring defendant's compliance with the Act. The relevant labor base used for her statistical data is the male-female composition of the defendant's total work force. There are no specific educational or professional qualifications required for employment in defendant's organization, except for inspectors in RPIA where completion of 2 years in an agricultural college is a prerequisite. Accordingly, it is likely that there would be a closer parity in numbers between men and women using a relevant labor supply geographic area as a data base than is the case when defendant's work force becomes the subject of a statistical profile. Since such a yardstick favors defendant, it cannot complain.

■ The data itself conclusively establishes plaintiff's claim of discrimination against women throughout defendant's work force at the managerial and technical levels. Indeed, defendant's own representations to the EEOC in reports filed with that agency for 1974, 1975, 1976 and 1977 reveal an all but total absence of women from management positions, underrepresentation in technical and professional positions and gross overrepresentation at the clerical level. The substantial disparity between men and women shown in those reports alone suffices to make plaintiff's prima facie case. See Robinson v. Union Carbide Corp., supra, 538 F.2d at 661.

Plaintiff has sought to translate the statistical data into standard deviation units. It is urged that where the difference between the actual number of women employed at the managerial, technical and clerical levels and the expected number is greater than 2 or 3 standard deviations, the likelihood that this results from chance rather than purposefulness is remote. The United States Supreme Court has accepted as meaningful a similar statistical analysis in discrimination cases. See e. g. Casteneda v. Partida, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); in accord Board of Education of the City School District of the City of New York v. Califano, 584 F.2d 576, 584 (2d Cir. 1978). Here the differences can be expressed in 4.09 and 4.50 standard deviations in 1977 and 1975 respectively at the managerial level, in 9.13 and 9.26 standard deviations in 1977 and 1975 respectively in re technical positions and as 14.50 and 14.64 standard deviations in 1977 and 1975 respectively in clerical posts. While the universe measured was smaller than is ordinarily utilized for this type of analysis, the grossness of the statistical disparity shown, coupled with the home made tests, job descriptions and quali-

fications, the lack of objective criteria, the total discretion given the department head to make the choice and the absence of any restraint to prevent discrimination clearly suffice to establish by a fair preponderance of the evidence that defendant has and is subjecting its female employees to employment discrimination because of their sex.

Defendant objects to plaintiff's statistical data. It is urged that different data bases were used in several instances. In one instance it is claimed that an employee was erroneously classified as a clerk instead of a technician, but that fault apparently originated in defendant's records. Defendant also contends that the only relevant data are those relating solely to the New York office of TEA. That argument, however, was rejected before trial when the court determined that plaintiff was entitled to represent all female employees in defendant's total work force.

The contention that because EWIB and RPIA are composed largely of inspectors required to have two years at an agricultural college and since those responsible for recruiting over the years have found few women interested in such employment does not excuse the gross disparity. Nor is the claim that the work of an inspector in RPIA and EWIB is hazardous, necessitates heavy work, crawling, lifting, and bending and requires inspectors to be in areas in the early morning and late at night with high crime rates acceptable as a rebuttal to plaintiff's case.

First, I do not credit the testimony of witnesses that over a long period of time, no women at their annual agricultural college recruitment sessions were interested in employment as RPIA inspectors. Defendant has supplied no figures on the number of women enrolled in agricultural colleges during the periods the witnesses were in charge of defendant's recruitment efforts, but it had been and is my impression that the number has not been unsubstantial. Without some evidence in that regard, I refuse to credit testimony that few women were interested in working as inspectors for RPIA based on the recruitment and inter-

viewing of students at agricultural colleges. That testimony was conclusory; indeed it is clear from Coggins' and Van Keuren's testimony that they did not expect to find women agricultural college students interested in the work of an RPIA inspector. Certainly, this testimony cannot explain the dearth of EWIB female inspectors where no educational qualifications are needed. In any event, whatever the actuality, the burden was defendant's to carry, and it has failed to do so. At any rate, after this lawsuit was instituted EWIB was able to find one and RPIA two women ready, willing and able to accept employment as inspectors.

The other given reasons for the dearth of female inspectors are equally unpersuasive because they go to the supposed inherent nature and lack of ruggedness of women in general and are not based on the characteristics of any individual female candidates for employment. Indeed, the record establishes that at least one of defendant's female employees actively sought employment in EWIB as an inspector, and that her application was forwarded to New York for consideration—a procedure which had never been applied before or since when a male application was involved.

It has been held violative of Title VII to refuse to allow women to work overtime because of the belief that women cannot work the long hours men can, *Schaeffer v. San Diego Yellow Cab, Inc.*, 462 F.2d 1002 (9th Cir. 1972); to force women to retire at an earlier age than men on the theory that men could perform adequately longer than women, *Rosen v. Public Service Electric & Gas Co.*, 477 F.2d 90 (3d Cir. 1973); *Bartmess v. Drewrys U.S.A., Inc.*, 444 F.2d 1186 (7th Cir.) *cert. denied*, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971); to require married women to resign since women could not take care of a home and work at the same time, *Sprogis v. United Air Lines*, 444 F.2d 1194 (7th Cir.) *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); to refuse to hire men as flight attendants due to their emotional unsuitability for such a job, *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385 (5th

Cir.) *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); to refuse to hire women as telephone switchmen because of their constitutional incapacity to do heavy work or to work the long hours, *Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228 (5th Cir. 1969); to refuse to hire women with preschool children in the belief that family responsibilities would interfere with job performance. *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). Thus, all the reasons advanced by defendant for lack of female employees based on the hazards of the work, their disinterest in such work, its difficulty or the heavy labor required must be rejected as being no more than culturally biased, stereotyped concepts.

Plaintiff has established that the old pattern of discrimination against women in re promotional opportunities persists. The test for Manager, Freight Department was clearly a farce. It may well be that the man chosen had superior qualifications, but the testing was unfair and clearly constituted going through the motions. It certainly was not a good faith effort by defendant to provide an equal opportunity for the women applicants. The selection process for the systems programmer was equally at fault. To specify job qualifications which favor, as between only two possible contenders, the man over the woman on what appears to me to be an unsubstantial difference between computer science credentials from New York University or an approved IBM computer science school, seems wholly arbitrary. Moreover, as indicated, I do not credit Rogers' testimony that he did not realize when that job was created that only two persons on his staff could possibly qualify for it.

Obviously, advancement cannot depend solely on objective criteria, but where subjective determinations are made, at the very least they should be fair. *Rich v. Martin Marietta Corp.,* 522 F.2d 333 (10th Cir. 1975).

On the basis of this record plaintiff has established that female employees as a class have been subjected to disparate treatment because of their sex and that the disparity is purposeful. As such, plaintiff has established a prima facie case of sex discrimination by a fair preponderance of the evidence. *See Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 408 (1974); *Robinson v. Union Carbide Corp.,* 538 F.2d 652 (5th Cir. 1976), *modified,* 544 F.2d 1258, *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977).

Thus, the burden shifted to the defendant to rebut plaintiff's case, and its failure to do so compels the conclusion that its policies and practices violate the Act. *See Stewart v. General Motors Corp.,* 542 F.2d 445 (7th Cir. 1976) *cert. denied* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). Protestations of good faith are, of course, not enough. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 877 (6th Cir. 1973). Disparate treatment of male and female employees can be sustained against a Title VII challenge only if the employer can establish business necessity justifying the disparity, or a bona fide occupational qualification reasonably necessary to the business operation. *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Chastang v. Flynn and Emrich Co.,* 541 F.2d 1040, 1043 (4th Cir. 1976). A business necessity defense requires more than a mere showing that the questioned practices or policy served some legitimate managerial function, *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662 (2d Cir. 1971). Instead, the challenged practices must be essential with no other reasonable alternative available. *United States v. N. L. Industries, Inc.,* 479 F.2d 354, 364–65 (8th Cir. 1973); *Robinson v. Lorillard, Corp.,* 444 F.2d 791, 798 (4th Cir.) *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). Defendant's rebuttal evidence does not come close to meeting this standard. Accordingly, plaintiff has not only estab-

lished a prima facie case of discrimination against defendant's female employees as a class, but she has met the ultimate burden of persuasion, *see Croker v. Boeing Co. (Vertol Div.)*, 437 F.Supp. 1138, 1183 (E.D. Pa.1977), warranting the entry of judgment against defendant on the issue of liability.

IT IS SO ORDERED.