**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; Sammie L. Currie, Plaintiffs,**

v.

**AKRON NATIONAL BANK AND TRUST COMPANY, Defendant.**

**Civ. A. No. C77–5A.**

United States District Court, N. D. Ohio, E. D.

May 21, 1980.

Bruce B. Elfvin, Regional Atty., Robert S. Bauders, Supervisory Trial Atty. and Paul J. Mason, Trial Atty., E. E. O. C., Cleveland, Ohio, Mark H. Ludwig, Akron, Ohio, for plaintiffs.

Edward C. Kaminski, Akron, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff, the Equal Employment Opportunity Commission (the Commission), instituted this action to redress alleged employment discrimination by defendant, the Akron National Bank, now Banc Ohio National Bank, (the bank). The bank is an Ohio corporation doing business in the City of Akron and surrounding communities throughout Summit County. It is engaged in all phases of banking, credit and investment transactions for the general public. At the time of trial, in addition to its main office ("the Akron facility"), the bank operated twenty–two branch offices. The Commission's specific allegations are that the bank has engaged in sex discrimination by (a) engaging in job assignment practices that have an adverse effect upon women; (b) failing to provide women with salaries equal to men performing similar or compa-

rable work because of their sex; and (c) failing to promote women into management and officer positions because of their sex.

Ms. Sammie L. Currie sought and was granted leave to intervene as a plaintiff in this action. Ms. Currie, an employee of the bank or one of its predecessors since 1966, was the charging party before the Commission. By her complaint in intervention, she has alleged that defendant discriminated against her in the following manners: (a) by failing and refusing to assign her to job classifications on the same basis as males; (b) by failing and refusing to provide and apply equal standards to her and similarly situated males; (c) failing and refusing to provide equal pay to her in accordance with her abilities and performance ratings; and (d) failing and refusing to apply equal standards to her in promotional and/or related opportunities.

A short time prior to the trial of this action, defendant moved to dismiss "all claims advanced by plaintiff in its first amended complaint except those alleging failure to promote women into management and officer positions in the branch operations of the bank, and advancing claims that defendant fails to provide women with salaries equal to men performing similar comparable work in non–teller branch operations." Because of the imminence of the trial date, the Court deferred ruling on defendant's motion until the issuance of its opinion on the merits. Upon consideration and for the reasons stated below, said motion shall be denied.

## I.

### A.

As mentioned previously, Ms. Currie was the charging party before the Commission. Her original charge, filed on October 21, 1974, recited that a male employee with much less experience had been promoted over her. Her charge also included the following allegations:

I further believe that the respondent is discriminating against not only me, but all women in the bank in pay rate, promotions, and insurance benefits.

There is quite a difference in the starting rate between men and women to do the same job as teller. The base starting rate for women at the present time is $365.00 per month, for a man it is from $50.00 to $100.00 higher.

On April 28, 1975, Ms. Currie filed an amended charge as follows:

On September 6, 1974, a male payroll teller was promoted over me to assistant manager and head teller. He has about 2 years service, while I have about 9 years service and have held a wide range of positions in the bank. Many other women have never been considered for promotion into management positions because of their sex. Female tellers are hired at a pay rate of approximately $365.00 per month, while male tellers commonly start at $50.00 to $100.00 per month higher. The bank's insurance plan does not allow payment of benefits in pregnancy cases.

The Commission thereafter investigated Ms. Currie's charge and, on November 28, 1975, issued a three page determination letter that was, in pertinent part, as follows:

Respondent's personnel policies operate to exclude a substantial proportion of women from attaining promotions to management and officer positions. Further, the few women who have achieved management level jobs have not been promoted as rapidly as men, and often are paid lower wages than similarly situated men. Accordingly, the Commission finds reasonable cause to believe that respondent discriminates against women as a class with regard to promotions and wages, in violation of Title VII.

. . . . .

In September, 1974, a male employee was promoted from head teller, salary grade five, to assistant branch manager. This male was hired in 1971 as a head teller trainee at a rate of pay higher than that accorded regular tellers. He had no related experience at hire. Another male with no prior experience was also hired as a head teller trainee. No females were hired as or promoted to head teller train-

ee, although qualified women were available in respondent's work force. Respondent stated that branch managers are frequently promoted from the head teller position.

. . . . .

[T]he Commission finds reasonable cause to believe that the male promoted has received preferential treatment since his hire, and thus that charging party's sex was a factor in respondent's decision not to promote her to assistant branch manager, as alleged.

With respect to the wage allegation, the evidence shows no disparity in the wages paid to female tellers at hire in comparison to the salaries paid similarly situated males. Accordingly, the Commission does not credit this allegation.

. . . . .

Having determined that there is reasonable cause to believe that respondent has engaged in unlawful employment practices, the commission invites the parties to join with it in a collective effort toward a just resolution of this matter . . . .

Conciliation efforts were thereafter initiated by the Commission. Defendant claims that those efforts consisted solely of the presentation of a "Conciliation Agreement" by the Commission and its rejection by defendant.

Defendant's motion to dismiss is based upon an assertion that the following "allegations of the complaint," were neither included in the Commission's reasonable cause determination or were the subject of conciliation efforts:

1.  Extension of the claims of plaintiff to the "Akron facility" [as opposed to being limited to the bank's branches];

2.  Those portions of the allegations of Paragraph 7(b) dealing with equal pay in the teller classifications;

3.  The allegations of Paragraph 7(c), which deals with job assignment practices; and

4.  Any other, nonspecified allegations which plaintiff may assert.

### B.

This Court agrees with defendant that a reasonable cause determination and conciliation efforts are a prerequisite to the filing of an action by the Commission. Section 706(b) of Title VII, 42 U.S.C. § 2000e–5(b), provides in relevant part as follows:

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, . . . alleging that an employer . . . has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge . . . on such employer . . . within ten days, and shall make an investigation thereof. . . . If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.

. . .

The Court does not agree, however, that these requirements have not been satisfied for the charges included in plaintiff's complaint.

■ Before addressing the merits of defendant's motion, it is necessary to dispose of a preliminary matter. Among the evidence submitted by defendant in support of its position are a document captioned "Conciliation Agreement" and an affidavit prepared by one of its attorneys. The "Conciliation Agreement" allegedly sets forth the terms upon which the Commission was willing to settle this action short of litigation. The affidavit contains details of negotiations between the bank and plaintiff in the same regard. According to defendant, neither the settlement negotiations nor the proposed agreement addressed the claims it now seeks to have stricken from the complaint.

The Court finds that it would be inappropriate to consider the proffered items as evidence of the scope of either the Commission's reasonable cause determination or of its conciliation efforts. Section 706(b), 42

U.S.C. § 2000e–5(b), provides that "[n]othing said or done during and as a part of . . . informal endeavors may be . . used as evidence in a subsequent proceeding without the written consent of the persons concerned." Additionally, Section 706(f)(1), 42 U.S.C. § 2000e–5(f)(1), provides that the Commission may bring an action if it is unable to secure "a conciliation agreement acceptable to the Commission." Clearly, even if the proffered evidence could properly be considered, it could not be viewed as setting forth all relief to which the Commission reasonably believed that it was entitled. If it hopes to further the obvious desire of Congress that employment discrimination claims be settled short of litigation, the Commission must be willing to accept conciliation agreements that afford less relief than it thinks would be afforded by a court following a trial. Few defendants would be willing to settle if they knew that the scope of relief that could be awarded by a court was limited to the plaintiff's settlement demand. Accordingly, the Court will disregard the proffered "Conciliation Agreement" and affidavit.

■ As noted, however, conciliation efforts are a prerequisite to an action by the Commission. The scope of those efforts is defined by the reasonable cause determination. That is, once there is a reasonable cause determination, any conciliation efforts must be viewed as an attempt to settle all claims that were included within that determination. Defendant has conceded that there were conciliation efforts in this case. The issue on its motion to dismiss, therefore, is whether the claims that it is attempting to have stricken were within the reasonable cause determination.

Defendant's first contention is that there was no reasonable cause determination and conciliation efforts regarding its "Akron facility." The Court, however, does not agree.

Although parts of the Commission's reasonable cause determination were addressed specifically to the "branch operations," other parts were clearly addressed to the bank as a whole. In particular, the following factual recitation was clearly not limited to the "branch operations":

> Creditable documentary evidence of record reveals that seventy percent of respondent's workforce is female, yet only eight women (9.4%) held managerial positions at the time the charge was filed. Only three of the eight women hold titles, meaning that they are officers of the bank. Two of these women are assistant cashiers, the lowest level officer. One manages a division. All of the male division managers are at least assistant vice–presidents. The third woman is called assistant secretary. There are no male assistant secretaries. These three women have service dates ranging from 1933 to 1945. No males in the sample, regardless of title, have length of service anywhere near that of these women.
>
> One female employee is a department manager. She is not an officer. All the male department managers hold titles. The remainder of the female managers in the headquarter's offices are supervisors. In the branch operation, . . .

The Court finds, therefore, that the Commission's reasonable cause determination and, necessarily, conciliation efforts growing out of that determination, were not limited to the bank's "branch operations." Accordingly the first part of defendant's motion to dismiss shall be denied.

By the second part of its motion, defendant seeks dismissal of "[t]hose portions of the allegations of Paragraph 7(b) dealing with equal pay in the teller classifications." Paragraph 7(b) of the complaint charges defendant with "[f]ailing to provide women with salaries equal to men performing similar or comparable work because of their sex." This part of defendant's motion is based upon the Commission's finding, stated in its reasonable cause determination, "[w]ith respect to the wage allegation, the evidence shows no disparity in the wages paid to female tellers at hire in comparison to the salaries of similarly situated males." This statement is in direct response to Ms. Currie's charge that male tellers were paid $50.00 to $100.00 more at hire than were female tellers.

Although the Court agrees with defendant's argument that the Commission cannot recover upon a claim for which it found no probable cause, that agreement will not permit the broad ruling that defendant seeks on this issue. The Commission's finding of no probable cause was clearly limited to the issue of disparate pay rates between male and female tellers *at hire*. The question of disparate pay between male and female tellers after being on the job long enough to have received a pay raise would be within the general finding of probable cause rather than the more limited finding of no probable cause. Likewise, assuming it is possible to recover based upon disparate wage rates for different positions of equal value to the bank, such a claim, so far as it involves tellers, would be within the probable cause determination.

The Commission did not offer any evidence at the trial of this action tending to prove disparity of wage rates between male and female tellers at hire. Accordingly, the Court finds that to the extent that defendant would be entitled to a ruling on the second part of its motion to dismiss there is no need to grant such a ruling.

The third part of defendant's motion is addressed to paragraph 7(c) of the complaint. That paragraph charges defendant with "[e]ngaging in job assignment practices that have an adverse effect upon women." Defendant asserts that this claim was not only not the subject of a reasonable cause determination, but also had not been included in Ms. Currie's charge to the Commission.

Initially, the Court finds that this charge was within the Commission's reasonable cause determination. As noted previously, that determination was, in part, as follows:

No females were hired as or promoted to Head Teller Trainee, although qualified women were available in respondent's workforce. Respondent stated that branch managers are frequently promoted from the Head Teller position. . .

Clearly this constitutes a determination of reasonable cause to believe that the defendant engaged in job assignment practices that adversely affect females.

Secondly, although Ms. Currie's charge did not include an allegation that women were adversely affected by defendant's job assignment practices, the Court finds that defendant's job assignment practices were "within the scope of an investigation reasonably related to [Ms. Currie's] charge." *EEOC v. Bailey Co., Inc.*, 563 F.2d 439, 449 (6th Cir. 1977). This is emphasized by the fact that defendant's defense to the charge that it failed to promote women into management and officer positions is, in part, based upon an assertion that women were not present within the positions that served as a pool for such promotions. Clearly, the Commission's investigation would be expected to include examination of one of the possible reasons females were not in those positions.

The Court finds that the allegations of paragraph 7(c) of the complaint are within the Commission's reasonable cause determination and, further, that those findings were within the scope of the investigation reasonably related to Ms. Currie's charge. Accordingly, the third part of defendant's motion shall be denied.

By the final part of its motion defendant seeks dismissal of "[a]ny other, nonspecified allegations which plaintiff may assert." The Court is not aware of any evidence presented at trial on issues other than those specifically addressed in the complaint. Nothing, therefore, would be gained if the Court were to grant this part of defendant's motion. Accordingly, the final part of defendant's motion shall be denied.

Based on the foregoing, defendant's motion to dismiss is hereby denied. The following shall constitute findings of fact and conclusions of law on the merits of this action as required by Rule 52, Federal Rules of Civil Procedure.

## II.

### A.

#### 1.

Mr. Harvey C. Kroeger was in charge of the bank's personnel department from 1966

through 1975. He received all his personnel training on–the–job. Between 1966 and 1970, he participated in virtually all hiring done by the bank. Between 1970 and 1975, Mr. Harold Osborn was responsible for recruiting and hiring under Mr. Kroeger's supervision. Mr. Osborn received on–the–job training in personnel matters from Mr. Kroeger and, in addition, attended an American Bankers personnel school.

During Mr. Kroeger's tenure in charge of the personnel department, there was no formalized procedure for hiring new personnel. Usually the personnel department would be notified of an opening in a branch or department by the head of that branch or department. The department would then conduct screening interviews. Some candidates for such interviews were walk–ins, but most came from state or private employment agencies.

During this period, the personnel department followed no written or standard guidelines concerning requirements or qualifications for job applicants. Mr. Kroeger testified, however, that he considered a candidate's appearance, personality, and character as "factors" in making a hiring decision. If a particular candidate was found acceptable by the personnel department, he was then referred to the branch or department head who would decide whether to hire him.

Most of the positions for which the bank hired during the period under consideration required no education beyond high school. Among such positions were those of clerk, clerk–typist, teller, general clerk, proof machine operator, and collector adjuster. Some of these positions did, however, have special skill requirements. The position of clerk–typist, for example, would require some typing skills; general clerk would require office skills; and teller would require minor skills in mathematics and money handling.

Mr. Kroeger was directly involved in all promotion decisions made at the bank from 1966 through 1975. Opportunities for promotion would not be posted, rather they would be communicated solely by word of mouth. An individual would not be considered for promotion unless recommended by the head of his branch or department. A person desiring to be considered for promotion was expected to either communicate that desire to the head of his branch or department or to one of the members of the personnel department. Mr. Kroeger testified that most promotions were from one position within a branch or department to another position within the same branch or department.

Mr. Kroeger testified that promotion decisions were actually made by branch or department heads "counseling with personnel." As with recruiting, the personnel department maintained no written guidelines on promotions. According to Mr. Kroeger, in making a decision of whether to promote an individual, consideration would be given to their ability to get along with other employees, their customer relations, their appearance, and their past job performance. If the person under consideration was a teller, among the items examined would be their balancing record and their check loss record.

Prior to 1975, there were no written guidelines maintained at the bank concerning salary levels. Salaries were set by the department or branch head with the advice of the personnel department. Mr. Kroeger testified that the department maintained "benchmark mental notes" of acceptable levels for various positions.

During 1974, steps were taken to commence a formalized salary administration program for all non–titled positions.[1] Non–

1. A memorandum dated January 24, 1975, listed the following goals that the program was expected to achieve:
   1. Maintain a uniform structure of job relationships so that employees with comparable responsibilities in different areas will be compensated in a similar manner.

2. Maintain salary levels that are competitive with like employers so that we can attract and retain qualified employees.

3. Provide incentives to encourage employees to perform their jobs efficiently.

titled positions are all those other than officer positions. In connection with the establishment of the program, every non–titled employee was asked to complete a position analysis questionnaire about the content and scope of their job. Following completion by the employee, the questionnaire was reviewed by that employee's immediate supervisor to ensure accuracy. Following that initial review, each questionnaire was reviewed by the management of the particular department within which the employee worked.

Following the position analysis, each supervisor evaluated the jobs in his department or branch. Relative values were established by assigning points from a rating scale. Among factors considered in assigning points were necessary education and experience levels, complexity, degree of independent action, number of subordinates supervised, and asset management. Subsequently, the point values assigned by the supervisors to each position were reviewed by a task force comprised of a cross–section of management personnel to ensure the validity of the assignments.

The final step in the formulation of the salary administration program was the placement of each job into a salary grade between one and eleven based upon the total number of points that had been assigned to it. Each grade was then assigned minimum and maximum salary ranges.

2.

Mr. Kenneth Vander Sluis joined the bank during 1975 as Personnel Officer and Manager of Employee Relations. Following a short period during which he and Mr. Kroeger shared duties, he became the head of the personnel department. He remains in that position and his current title is vice president.

Mr. Vander Sluis has a master's degree with a systems concentration. Prior to his employment with defendant, he had held a similar position with another bank for about seven years. Prior to that, he was Director of Admissions at a college. As

head of the bank's personnel department, he has supervised hiring, promotion, and assignment of salaries.

Mr. Vander Sluis recruits candidates for employment with the bank through public and private employment agencies, newspaper advertising, and the Urban League. A number of walk–in applicants are also interviewed. Mr. Vander Sluis testified that among the things that he examines when seeking employees are their appearance, personality, personal interests, health problems, work record, education, what their prior job was, how long they held it, and why they left. Applications of persons not immediately hired are retained for future reference.

Prior to institution of the salary administration program, with one exception, the only formal evaluations of the bank's employees' job performances had taken place forty–five and ninety days after their first becoming employed. The one exception was an evaluation that was carried out during 1971.

Since 1975, each employee has been evaluated annually on the anniversary of his first being employed by the bank. Mr. Vander Sluis testified that the salary level that an employee receives within his salary range is determined by his performance.

At the time of trial, opportunities for promotion were still not posted at the bank. A particular individual would be considered for promotion only if recommended by his division head, department head, or another officer. Mr. Vander Sluis testified that his role in regard to promotion is to serve as an advisor. He also testified that characteristics that would be reviewed in making a promotion decision were the quality of the candidate's past performance, the quantity of work that they were able to handle, their judgment, their initiative, their dependability, and their attendance record.

Mr. Vander Sluis testified that since a time prior to when he joined the bank there has been an informal branch management training program. He stated that candi-

---

4. Ensure internal consistency in decisions affecting employees' salary levels.

5. Facilitate the work of managers by providing a tool to administer salaries.

dates for the program are chosen from the positions of head teller and new accounts receptionists at the branch banks. Candidates are given about six months of training in areas such as loans or credit administration in order to qualify them for the position of assistant branch manager.

The bank also now has a more formal management training program. The structure of the program was designed by Mr. Vander Sluis during the first half of 1977 and described in a memorandum to all bank employees during July of that year. The memorandum listed a number of requirements for participation in the program including a college education or, in lieu thereof, at least two years of college level study supplemented with two years of bank work experience for each additional year of college study that would be required to complete a degree. It was also stated in the memorandum that credit would be provided for completion of American Institute of Banking courses. A participant in the program is provided between a year and two years of intensive bank–wide training. A trainee spends time in every functional area of the bank including loan areas, mortgage, credit cards, commercial, credit services, installment, and the trust departments.

Employees interested in participating in the training program were instructed to submit a letter indicating why they desired to enter the program and what career goals and objectives they had developed. Twenty–one employees initially responded of which five, three females and two males, were selected for participation. At the time of trial, five additional employees, three females and two males, had also begun participation in the program.

### B.

Ms. Currie, a high school graduate, was first employed by the Akron Dime Bank, one of defendant's predecessors, during April, 1966. Prior to that time, she had been employed as a cashier in a grocery store and, before that, in a drugstore. She left her position in the grocery store because she no longer desired to work the late hours it required.

Ms. Currie initially served as a teller trainee for about two weeks at the bank's main office. She then was assigned to the bank's Main and Exchange Street office where she served through 1974. During her time at that office, Ms. Currie served in numerous positions gaining a wide range of banking experience. Among positions she was assigned to at various times were those of commercial teller, mail teller, savings teller, savings specialist, and processor of both installment and commercial loans. She also received training in the areas of new accounts, collections, safety deposit boxes, bond sales, and land contracts. During 1973, although still primarily assigned to the Main and Exchange Street office, she filled in as a receptionist in numerous other branches. In addition to her other duties, from 1970 through 1974, she served as a member of an auditing team that conducted counts of cash, traveler's checks, bonds, and food stamps at various branches of the bank.

During this period, Ms. Currie also furthered her knowledge of banking by enrolling in a number of courses offered by the American Institute of Banking. Her grades in those courses were better than average.

One of Ms. Currie's supervisors during this period testified that she had been a good employee. That testimony is supported by what little documentary evidence was presented concerning her job performance at the Main and Exchange Street office.

Sometime during the summer of 1973, Ms. Currie learned that the bank was building a new branch at Wilbeth Road. She contacted Mr. Kroeger and requested that she be considered for a position when the new branch opened.

When the Wilbeth Road office opened, during January 1974, Ms. Currie was assigned to serve as its New Accounts Receptionist. The branch manager was Cyrus Thornton and Duane French was the head teller. There was no assistant branch manager.

Mr. Thornton had first joined the bank in its collection department during 1961 and prior to that time had operated a service station. After about four years in the collection department he became a loan officer. He remained in that position until approximately 1970 when he became an acting branch manager. In that position he filled in at various branches. During 1971 he became manager of the bank's Wooster–Hawkins branch where he remained until the opening of the Wilbeth Road branch.

Mr. French did not testify at the trial of this action nor was his personnel file presented as evidence. The only indication of his experience prior to the opening of the Wilbeth Road branch was Mr. Thornton's testimony that he had previously served as a head teller at the bank's Brittain–Tallmadge branch.

The specific event that motivated Ms. Currie to file her charge with the Commission was Mr. French's promotion, on September 6, 1974, to the dual position of head teller/assistant manager. She has alleged that she was more experienced and better qualified but was denied the promotion because she is a female.

### III.

As noted previously, Ms. Currie filed her original charge with the Commission on October 21, 1974. At that time, Section 706(e) of the Civil Rights Act of 1964 required that a charge must be filed within 300 days of any discriminatory act for which recovery was sought. Based upon this fact, the bank has urged that the Court may consider events occurring prior to December 25, 1973 (300 days before October 21, 1974) only as background and not as a basis for imposition of liability in this case. The Court agrees with the bank's position on this issue in one regard. That is, the Court finds that the Commission cannot recover in this action based upon discriminatory job assignments occurring prior to December 25, 1973. As held by the Supreme Court in *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977):

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered it is merely an unfortunate event in history which has no present legal consequences.

*See also, Trabucco v. Delta Airlines*, 590 F.2d 315 (6th Cir. 1979). Although the plaintiff in *Evans* was an individual, its holding is clearly applicable to an action, like the present, brought by the Commission. There is no reason that would permit the anomaly of the Commission being able to recover for acts for which the individual discriminated against could not himself recover.

There is, however, a distinction between that part of the Commission's complaint based upon initial job assignments and those parts based upon allegedly discriminatory salary and promotions to management and officer positions. An initial job assignment is a single act that is completed upon a specific date. The failure to pay a non–discriminatory rate and the failure to award promotions in a non–discriminatory manner, however, are violations of a continuing nature. *See Kennerly v. Aro, Inc.*, 447 F.Supp. 1083, 1085–86 (E.D.Tenn. 1976). If the Commission is able to prove such continuing wrongs that did not cease prior to December 25, 1973, that part of those violations that occurred prior to December 25, 1973 can be a basis for liability to the same degree as that part that occurred after such date. Of course, any back–pay award under Title VII is limited to two years prior to the filing of the charge. Section 706(g) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(g).

Accordingly, the Court holds that evidence of discriminatory job assignment practices occurring prior to December 25, 1973 may be considered only as background material. If the Commission succeeds in proving the bank engaged in discriminatory

salary and promotion practices that continued until a date after December 25, 1973, the part of those practices occurring prior to that date may serve as the basis of an imposition of liability.

## IV.

Both the Commission and the bank presented a large amount of statistical evidence in this case. The Commission contends that its statistical evidence demonstrates that the bank has engaged in a pattern and practice of sex discrimination in the areas of job assignments, salaries, and promotions to management and officer positions. The bank contends that the Commission's statistics do not prove such discrimination and that the bank's statistics demonstrate an absence of such a pattern and practice. Although "[s]tatistics are equally competent in proving employment discrimination" as other evidence, they "are not irrefutable; they come in infinite variety . . . ." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339–40, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). In order to evaluate this evidence, therefore, it is first necessary to examine how the statistics were generated.

## A.

The data from which the Commission's statistics were generated was gathered from the personnel files of 1160 individuals employed by the bank between January 1, 1970 and August 31, 1976. Some of this information was such that it could be entered directly onto keypunch sheets. Other items of information had to first be coded and the code entered on the sheets.

The first item entered on each sheet was the individual employee's social security number. Next his last name and first initial were recorded. Next a code for the employee's sex and the date he was hired by the bank were entered.

The next item of information recorded was the job into which the employee was placed upon hire. This information was entered by way of a code based upon the salary ranges established by the bank during 1975. That is, a number between 1 and 11 was used to indicate the salary range of the employee's initial position. In addition to the eleven salary ranges, two additional numbers were used as a code for the positions of junior and senior officers.

Inasmuch as the salary administration program did not exist prior to 1975 and the bulk of the information the Commission desired to enter into its data base was from prior to 1975, it was necessary for it to project the salary ranges back into time. Its efforts in this regard were reviewed by an expert in the field of personnel management familiar with the type of "point factor system," used by the bank to establish its program. He found the results of the Commission's efforts, with a small number of changes, "as accurate as possible given the limitations of the data. . . ." Although the bank has suggested that this "projection" of salary ranges was flawed because of alleged changes in the duties involved in some positions, the Court finds such changes, if they occurred, would have been insignificant when viewed in perspective. *See generally, Ste. Marie v. Eastern R.R. Assoc.*, 458 F.Supp. 1147, 18 E.P.D. 4847, 4852 (S.D.N.Y.1978). Accordingly, the Court finds the Commission's efforts to have been a valid method of ranking positions based upon their relative values to the bank.

The next item of information entered on the keypunch sheets was a code for the amount of education possessed by the individual. This code was made up of the following five numerals:

0 = high school or less

1 = less than 2 years of college

2 = 2–4 years of college

3 = college degree

4 = post graduate work

College credits received after the attainment of a bachelor's degree was not coded as "post graduate work" unless the employee had so referred to it in his employment application or unless he had indicated that he had achieved or worked toward a post graduate degree.

The next data recorded was a code for prior experience. A two digit code was used for this purpose:

No prior banking experience = 0 in first digit

No prior bank–related experience = 0 in first digit

Prior bank–related experience = 1 in first digit

Prior banking experience = 2 in first digit

The number of years prior experience was entered as the second digit.

Prior banking experience was defined for application of the code as a managerial or professional type position in banking. Prior bank–related experience was a managerial or professional type position with a non-banking type employer. For individuals with nine or more years of prior experience, the numeral 9 was entered as the second digit of this code.

The next information entered was the "date of termination." If the employee's relationship with the bank ended between January 1, 1970 and August 31, 1976, the date of that termination was entered. If the individual was still employed on August 31, 1976, the space provided was filled in with zeros.

The next information recorded was the date of the latest job evaluation during the year 1971 and a code for the results of that evaluation. The code used for this purpose was a one digit code used to signify the overall results of the evaluation. Although the bank used a number of different forms, their formats were generally similar. They all provided multiple choice type responses for the evaluation of a number of different characteristics. The code used by the Commission was as follows:

0 = No evaluation

1 = Fair

2 = Good

3 = Very Good

4 = Excellent

The digit entered was the one best representing the overall rating for all the characteristics listed on the particular form.

The dates of the latest 1973 and 1975 evaluations and a code for their overall results were entered next. A code indicating the salary range of the job held on 12–31–71, 12–31–73, and 12–31–75 was next entered.

Next a group of pieces of information was recorded. The first item in this group was the last date for which an annual salary was entered on the individual's job history card between July 1, 1975 and August 31, 1976; the rate of that salary and the salary range of the position held on that date were recorded; the number of years in that position as of the date recorded was entered; finally, the date of the evaluation nearest to, and up to month subsequent to, that date and the results of the evaluation were entered.

The next information recorded was the employee's total years of service with the bank. For individuals no longer employed the date of termination would be used to compute the total years with the bank if it was a date prior to August 31, 1976. If it was a date after August 31, 1976, the total number of years would be entered as of August 31, 1976. If the person was still employed, the date for which the latest annual salary was recorded on the job history card was used to compute the total number of years with the bank. In all these calculations, any periods during which the employee was not employed full time were disregarded.

The next entry was the total number of years at the bank as of 12–31–71, 12–31–73, and 12–31–75. Finally, the individual's social security number was again entered.

B.

The data base used for generation of defendant's statistics, as would be expected, overlapped the Commission's data base to a large extent. The bank's data base, however, included information regarding 1600 individuals as opposed to the 1160 included in the Commission's. This difference resulted from the bank's inclusion of individuals employed through 1977.

As was true of the Commission, the bank gathered information from personnel files to construct its data base. There was one possible exception to this. The exception was a code that indicated whether the individual employee had been "employed", "unemployed", or "at home" prior to being hired by the bank. Although the determination of whether the person was "unemployed" or "at home" was apparently not made from the personnel files, defendant failed to offer any evidence of how that determination was made.

Defendant also included some information from the personnel files that the Commission had not included in its data base. For example, the bank included whether the employee had designated on his employment application a particular position for which he was applying and, if so, what that position was. The bank also included prior military service in its data base, and whether the individual had ever worked part-time during his career with the bank. In addition, rather than recording the salary range of positions held by individuals, the bank's job code included an assigned number for each position available at the bank.

## V.

■ The burden upon the Commission in this case is to "establish by a preponderance of the evidence that [sexual] discrimination was the [bank's] standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). "Statistical evidence is an important tool for placing seemingly in–offensive employment practices in their proper perspective." *Senter v. General Motors Corp.*, 532 F.2d 511, 527 (6th Cir. 1976). Statistics are particularly useful in cases, such as the present, in which great emphasis in employment decisions has been placed on subjective evaluations. *Id.* Although such a subjective evaluation process is not itself impermissible under Title VII, it often serves to "favor the incumbent class at the expense of the minority." *Id.* at 529. Clear-

ly, in such a case, "[w]here gross statistical disparities can be shown, they alone may . . . constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977).

### A.

■ The first set of tables presented by the Commission addresses the question of initial job assignments for the period of 1970 through 1975. For purposes of these tables, the Commission did not include individuals hired into officer positions and it grouped the salary ranges into five job categories:

| Salary Ranges | Males | Females | Row Total |
|---|---|---|---|
| 1 – 3 | 66 | 463 | 529 |
|  | 50.4% | 95.1% | 85.6% |
| 4 – 5 | 11 | 22 | 33 |
|  | 8.4% | 4.5% | 5.3% |
| 6 – 7 | 49 | 2 | 51 |
|  | 37.4% | .4% | 8.3% |
| 8 – 9 | 3 | 0 | 3 |
|  | 2.3% | 0% | .5% |
| 10 – 11 | 2 | 0 | 2 |
|  | 1.5% | 0% | .3% |
| Column Total | 131 | 487 | 618 |
|  | 21.2% | 78.8% | 100.0% |

This table, plaintiff's exhibit 23, table 1, demonstrates that during the period 1970 through 1975, the vast majority of individuals hired by the bank were initially assigned to positions in the lowest three salary ranges. It further demonstrates that while slightly over one half of the males hired during this period were placed in the lowest three salary ranges, 95.1% of all women employed were placed in those categories. Further, although 37.4% of all males employed were placed in positions in salary ranges 6 and 7, only .4% of the females hired were so placed. A chi square test was performed on the data shown on this table and the probability of this distribution having occurred by chance was found to be zero. *See Castaneda v. Partida*, 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281, n. 17, 51 L.Ed.2d 498 (1977).

746

The Commission also presented a set of tables that included individuals with no prior experience as defined on its data base for different educational levels. The first such table, plaintiff's exhibit 23, table 3, includes all individuals hired into non–officer positions between 1970 and 1975 with a high school education or less:

| Salary Ranges | Male | Female | |
|---|---|---|---|
| 1 – 3 | 15 / 83.3% | 274 / 96.5% | 289 / 95.7% |
| 4 – 5 | 2 / 11.1% | 10 / 3.5% | 12 / 4.0% |
| 6 – 7 | 1 / 5.6% | 0 / 0% | 1 / .3% |
| | 18 / 6.0% | 284 / 94.0% | 302 / 100.0% |

This chart demonstrates that no individuals with no experience and a high school diploma or less were placed above salary range seven. It also demonstrates that the bulk of the employees hired in with these characteristics were placed in salary ranges 1 through 3. Despite the small number of males included on this table, a chi square test showed that the premise that sex was not a factor in the initial placement of these individuals should be rejected.

Plaintiff's exhibit 23, table 4, demonstrates similar results for employees with up to two years of college:

| Salary Ranges | Male | Female | |
|---|---|---|---|
| 1 – 3 | 23 / 67.6% | 76 / 95.0% | 99 / 86.8% |
| 4 – 5 | 4 / 11.8% | 4 / 5.0% | 8 / 7.0% |
| 6 – 7 | 7 / 20.6% | 0 / 0% | 7 / 6.1% |
| | 34 / 29.8% | 80 / 70.2% | 114 / 100.0% |

Again, a chi square test proved these results were significant.

Plaintiff's exhibit 23, table 5, demonstrates the same pattern for employees with two to four years college:

| Salary Ranges | Males | Female | |
|---|---|---|---|
| 1 – 3 | 22 / 57.9% | 56 / 87.5% | 78 / 76.5% |
| 4 – 5 | 2 / 5.3% | 7 / 10.9% | 9 / 8.8% |
| 6 – 7 | 12 / 31.6% | 1 / 1.6% | 13 / 12.7% |
| 10 – 11 | 2 / 5.3% | 0 / 0% | 2 / 2.0% |
| | 38 / 37.3% | 64 / 62.7% | 120 / 100.0% |

A chi square test again demonstrated that these statistics were significant.

Finally, plaintiff's exhibit 23, table 6, shows the distribution of individuals with college degrees but no post–graduate work:

| Salary Ranges | Males | Females | |
|---|---|---|---|
| 1 – 3 | 6 / 20.7% | 53 / 98.1% | 59 / 71.1% |
| 4 – 5 | 2 / 6.9% | 1 / 1.9% | 3 / 3.6% |
| 6 – 7 | 20 / 69% | 0 / 0% | 20 / 24.1% |
| 8 – 9 | 1 / 3.4% | 0 / 0% | 1 / 1.2% |
| | 29 / 34.9% | 54 / 65.1% | 83 / 100.0% |

Again, the chi square test proved that the sexual distribution of new employees was significant.

Viewing these tables together, it appears that the amount of education that a new employee has exerts a positive influence for males but little influence for females. The Commission attempted to present evidence concerning the types of degrees held by males and females, but that data was

flawed as a result of errors made in the recording of the types of degrees held by females. The placement of new male employees with bachelor degrees, however, does not appear to have been affected by their field of study. This is demonstrated by the following table which is a combination of plaintiff's exhibit 24, table 2 and plaintiff's exhibit 24, table 3:

| Salary Range | Males with Business Degrees | Males without Business Degrees | |
|---|---|---|---|
| 1 – 5 | 4 | 2 | 6 |
| | 26.7% | 22.2% | 25% |
| 6 – 7 | 11 | 7 | 18 |
| | 73.3% | 77.8% | 75% |
| | 15 | 9 | 24 |
| | 62.5% | 37.5% | 100% |

This table shows that the results demonstrated by plaintiff's exhibit 23, table 6, cannot be explained by the type of degree held. As a matter of fact, it appears that a higher percentage of males with non–business degrees were placed into salary ranges 6–7 than males with business degrees. If females with college degrees were placed into salary ranges on the same basis as males with college degrees, the results shown on plaintiff's exhibit 23, table 6 would have been far different.

As noted previously, only placements occurring since December 25, 1973 can serve as a basis for liability in this action. The tables presented by the Commission show gross disparities in initial job placements seemingly based upon sex. If left unexplained, these statistics are proof of discriminatory placement for the entire period of 1970 through 1975. Inasmuch as there was no evidence that the bank placed females any differently after December 25, 1973 than it did before that date, the Court finds that the Commission has presented evidence sufficient to establish a prima facie case of sex discrimination during the period of potential liability. That is, the Court can infer, that if the different placement of males and females in the bank's work force is left unexplained, "it is more likely than not that such [placements] were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)).

The establishment of a prima facie case on this issue shifted the burden to the bank to "articulate some legitimate nondiscriminatory reason for the [differences in placement]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), quoted in *Furnco Corp.*, supra 98 S.Ct. at 2950. The bank has attempted to meet this burden in three ways. The Court finds that two of the ways relied upon by the bank were not capable of meeting its burden.

The bank asserted that the plaintiff's placement tables did not compare the bank's workforce to any standard. That is, the bank contended that many of the positions into which it was hiring required special skills and, as a result, it was necessary to compare its workforce make–up with the Akron Standard Metropolitan Statistical Area (SMSA). The SMSA statistics used for these purposes were from 1970.

There are a number of problems with this approach. First, although the bank asserted that many of the positions in which females were under–represented were positions requiring special skills, there was no evidence to support either this assertion or to show that its male hirees possessed any such special skills. The only skills about which evidence was presented were minor skills needed for the positions of clerk–typist, general clerk, and teller. Certainly, the fact that a female applicant had such skills could not justify limiting her to those positions. Secondly, if the Court were to assume that the bank's assertion is true, the SMSA statistics relied upon by the bank would still not prove that there were no females available to the bank for assignment to higher level positions. The SMSA statistics were from 1970 and the period of potential liability on this issue is the period following December 25, 1973. It is clear that the more active role taken by females in the workforce during the early 1970's

would have a large effect on the continued validity of the SMSA statistics relied upon. Further, inasmuch as the SMSA statistics were demonstrative of individuals holding the types of positions in question rather than of individuals with the capabilities and desire to hold such positions, those figures themselves could be tainted by the unfortunate practice of unequal treatment of females.

The Court finds, then, that the bank's comparison of its workforce with the 1970 Akron SMSA is insufficient to carry its burden. The standard by which the bank's placement of females must be measured is the standard used in the Commission's tables. That standard is the bank's placement of its equally qualified male employees. If, as the bank asserted, its male employees had skills required for placement in higher salary ranges and its female employees lacked those skills, the burden was upon the bank to present some evidence of that difference.[2]

The second method relied upon by the bank was "the family specialization theory." The bank contended that its female employees desired to hold only the lowest level positions available at the bank because of the difference in family roles between males and females. Again, the Court finds the bank's reliance on this theory insufficient to carry its burden. There was no evidence that this asserted phenomenon was actually present in the defendant's workforce to a sufficient degree to explain the gross disparities in initial job assignments reflected in the Commission's placement tables.

The third method by which the bank attempted to rebut the Commission's prima facie case was a little more on point. The bank contended that its female employees were placed in lower level positions because those were the positions they applied for whereas its male employees applied for higher level positions. In support of this contention, the bank presented a number of tables.

The first table presented was defendant's exhibit C–7. This table indicates the number of applicants and hirees for the years 1974 through 1978, by sex, with the exception of 1976 for which information was unavailable.

| | Applicants | | | Hirees | | |
|------|------|--------|----------|------|--------|----------|
| Year | Male | Female | % Female | Male | Female | % Female |
| 1974 | 234 | 829 | 78.2% | 29 | 113 | 79.6% |
| 1975 | 153 | 452 | 74.7 | 14 | 40 | 74.1 |
| 1977 | 303 | 677 | 69.1 | 20 | 91 | 82.0 |
| 1978 | 185 | 646 | 77.7 | 18 | 122 | 87.1 |

The next table presented was defendant's exhibit C–8–A which portrays the positions applied for and hired into during the years 1974 and 1975:

| | Applicants | | | Hirees | | |
|----------------------|------|--------|----------|------|--------|----------|
| | Male | Female | % Female | Male | Female | % Female |
| Professional & Tech. | 8 | 6 | 42.9% | 1 | 0 | 0.0% |
| Manager & Admin. | 17 | 1 | 5.6% | 9 | 0 | 0.0% |
| Clerical Tellers | 68 | 318 | 82.4% | 21 | 104 | 83.2% |

2. The Court notes that the Commission's analysis tested for differences in education and prior experience and found that neither of these explained the difference in job placement. The bank's statistics, in effect, proved that women were not hired into particular positions by the bank or by other employers. The burden upon the bank, however, was to prove why they were not so hired.

| | Applicants | | | Hirees | | |
|---|---|---|---|---|---|---|
| | Male | Female | % Female | Male | Female | % Female |
| Office Mach. Oper. | 0 | 11 | 100.0% | 2 | 3 | 60.0% |
| Recep. | 0 | 4 | 100.0% | 0 | 0 | 0.0% |
| Sec. | 0 | 47 | 100.0% | 0 | 7 | 100.0% |
| Typists | 0 | 13 | 100.0% | 0 | 8 | 100.0% |
| Collectors | 0 | 1 | 100.0% | 1 | 0 | 0.0% |
| Investors & Estimators | 0 | 0 | 0.0% | 1 | 0 | 0.0% |
| Other Cler. | 7 | 76 | 91.1% | 4 | 29 | 84.6% |
| Computer Oper. | 0 | 0 | 0.0% | 1 | 0 | 0.0% |
| Service | 1 | 0 | 0.0% | 3 | 0 | 0.0% |
| Total (Indicating Job Preference) | 101 | 477 | 82.5% | 42 | 151 | 78.2% |

The next table, defendants exhibit C–8–B, presents the same information for the year 1977:

| | Applicants | | | Hirees | | |
|---|---|---|---|---|---|---|
| | Male | Female | % Female | Male | Female | % Female |
| Professional & Tech. | 101 | 47 | 31.8% | 3 | 0 | 0.0% |
| Manager & Admin. | 49 | 15 | 23.4% | 2 | 1 | 33.3% |
| Clerical | | | | | | |
| Tellers | 60 | 317 | 84.1% | 6 | 41 | 85.4% |
| Bookkeeper | 2 | 21 | 91.3% | 0 | 0 | 0.0% |
| Off. Mach. Operator | 10 | 24 | 58.3% | 3 | 5 | 62.5% |
| Recep. | 0 | 8 | 100.0% | 0 | 1 | 100.0% |
| Sec. | 0 | 75 | 100.0% | 0 | 6 | 100.0% |
| Typists | 0 | 66 | 100.0% | 0 | 11 | 100.0% |
| Estimators & Invest. | 3 | 0 | 0.0% | 3 | 0 | 0.0% |
| Collectors | 11 | 4 | 26.7% | 3 | 1 | 25.0% |
| Other Clerical | 27 | 88 | 76.5% | 0 | 21 | 100.0% |
| Service | 29 | 9 | 23.7% | 0 | 2 | 100.0% |
| TOTAL | 292 | 674 | 69.8% | 20 | 89 | 81.7% |

The final table in this series, defendant's exhibit C–8–7, depicts the same information for the year 1978:

| | Applicants | | | Hirees | | |
|---|---|---|---|---|---|---|
| | Male | Female | % Female | Male | Female | % Female |
| Professional & Tech. | 45 | 16 | 26.2% | 0 | 4 | 100.0% |

| | Applicants | | | Hirees | | |
|---|---|---|---|---|---|---|
| | Male | Female | % Female | Male | Female | % Female |
| Manager & Admin. | 17 | 10 | 37.0% | 4 | 9 | 69.2% |
| Sales | 1 | 2 | 66.7% | 1 | 0 | 0.0% |
| Clerical Tellers | 37 | 345 | 90.3% | 6 | 61 | 91.0% |
| Bookkeeper | 3 | 17 | 85.0% | 0 | 0 | 0.0% |
| Off. Mach. Operator | 4 | 23 | 85.2% | 2 | 6 | 75.0% |
| Recep. | 0 | 6 | 100.0% | 0 | 0 | 0.0% |
| Sec. | 0 | 63 | 100.0% | 0 | 5 | 100.0% |
| Typists | 0 | 23 | 100.0% | 0 | 14 | 100.0% |
| Estimators & Invest. | 3 | 6 | 66.7% | 2 | 0 | 0.0% |
| Collectors | 10 | 7 | 41.2% | 0 | 6 | 100.0% |
| Other Clerical | 9 | 47 | 83.9% | 1 | 16 | 94.1% |
| Computer Operator | 7 | 1 | 12.5% | 2 | 0 | 0.0% |
| Service | 16 | 3 | 15.8% | 0 | 0 | 0.0% |
| TOTAL | 149 | 569 | 79.2% | 18 | 121 | 87.1% |

Initially, the Court notes that it is impossible to tell from defendant's exhibits C–8–A, C–8–B, and C–8–C whether the individuals hired into particular positions were the same individuals who applied for those positions. That is, the 104 females hired as tellers during 1974 and 1975 may have been 104 of the 318 who listed that position on their application. Alternatively they may have been 98 of those 318 plus the six females who applied for professional and technical positions. Further, inasmuch as defendant's exhibit C–7 indicates that 1281 women applied for positions during 1974 and 1975 and defendant's exhibit C–8–A reveals that only 477 of that number indicated a preference for any position, it is possible that none of the women hired as tellers indicated a preference for that or any other position.

Another difficulty results from a comparison of the number of applicants indicating a position preference during 1974 and 1975 with those doing so in 1977 and 1978. The large increase in applicants for particular positions in the latter years permits an inference that the personnel department encouraged such a selection after the filing of this lawsuit.

Based on the foregoing, the Court finds that the explanations asserted by the bank for the gross disparities exhibited by plaintiff's placement tables were pretexts. The Court finds that the bank has engaged in a pattern and practice of sex discrimination in initial job placements since 1970 and that such discrimination since December 25, 1973 is a basis for imposition of liability in this action.

B.

The Commission's second charge in this action is that the bank has discriminated against women in the salary paid for the performance of work similar or comparable to that performed by males. The Court finds that the Commission has failed to establish a prima facie case of illegal actions under Title VII in the area of salaries.

Plaintiff has presented a number of tables on the question of wages in an attempt to carry its burden on this issue. The problem is, however, as found previously, the code used by the Commission to indicate the position held by an individual on its data base was based upon the salary range of the position held rather than the position itself. Accordingly, plaintiff's wage tables compare the salaries of individuals holding positions in the same salary ranges but not necessarily of individuals holding the same positions. Further, the bank presented evidence that it has a number of positions in which all the employees were of one sex making comparisons between individuals of both sexes holding the same job very difficult. There was no evidence that individuals of opposite sexes were assigned different job titles although they were performing the same jobs.

The difference in wages paid females that is apparent from the Commission's tables is not necessarily the result of the payment of unequal wages to women for performing the same jobs as those performed by men. Rather, inasmuch as the Court has found that the bank has discriminated against women in job placements, it is possible that the results shown by the tables were caused by women being assigned to lower paying positions. The fact that those lower paying female positions were in the same salary range as higher paying male positions will not serve as the basis for a finding of liability on this issue:

> [The Commission] seek[s] a construction of Title VII that may establish a *prima facie* violation of the Act whenever employees of different sexes receive disparate compensation for work of differing skills that may, subjectively, be of equal value to the employer, but does not command an equal price in the labor market. [The Commission's] theory ignores economic realities. The value of the job to the employer represents but one factor affecting wages. Other factors may include the supply of workers willing to do the job and the ability of the workers to band together to bargain collectively for higher wages. We find nothing in the text and history of Title VII suggesting that Congress intended to abrogate the laws of supply and demand or other economic principles that determine wage rates for various kinds of work. We do not interpret Title VII as requiring an employer to ignore the market in setting wage rates for genuinely different work classifications.

*Christensen v. Iowa*, 563 F.2d 353, 356 (8th Cir. 1977) (footnote omitted).

Accordingly, the Court finds that the Commission has not carried its burden on that part of its claim based upon allegedly unequal wages. This claim, therefore, cannot serve as the basis of an imposition of liability in this action.

### C.

The Commission's final claim is that the bank has failed to promote women into management and officer positions because of their sex. The Commission has presented both statistical evidence and testimonial evidence on this claim.

There was a large amount of confusion concerning the question of what positions at the bank in terms of salary grades were "management" positions. This resulted in the Commission presenting two sets of tables, one set in which management was defined as positions in salary grades 8 through 11 and officers and one set in which management was defined as positions in salary grades 6 through 11 and officer. The Court finds that although there are a few management positions in salary grade 6, the bulk of those positions are in salary grades 8 through 11. Further, there are few non–management positions in those salary grades. Accordingly, for purposes of analysis, promotions to positions in salary grades 8 through 11 and officer shall be considered promotions to management.

The first table presented by the Commission on this claim is plaintiff's exhibit 33A, table 1. This table includes individuals hired into management as well as those promoted into management. It includes only promotions of individuals with one to two years experience:

| | Remained Non-Management | Promoted To Management | Hired To Management | |
|---|---|---|---|---|
| Males | 32 | 8 | 3 | 43 |
| | 74.4% | 18.6% | 7.0% | 21.1% |
| Female | 161 | 0 | 0 | 161 |
| | 100.0% | 0% | 0% | 78.9% |
| | 193 | 8 | 3 | 204 |
| | 94.6% | 3.9% | 1.5% | 100.0% |

This table included all individuals hired at the bank during 1970 and still employed at the end of 1972; hired during 1972 and employed at the end of 1973; and hired during 1974 and employed at the end of 1975.

The next table, plaintiff's exhibit 33A, table 2, portrays promotions of individuals with 3 to 4 years experience:

| | Remained Non-Management | Promoted To Management | Hired To Management | |
|---|---|---|---|---|
| Males | 15 | 12 | 2 | 29 |
| | 51.7% | 41.4% | 6.9% | 23.0% |
| Females | 97 | 0 | 0 | 97 |
| | 100.0% | 0% | 0% | 77.0% |
| | 112 | 12 | 2 | 126 |
| | 88.9% | 9.5% | 1.6% | 100.0% |

This table included all individuals hired during 1968 and employed as of year–end 1971; hired during 1970 and employed as of year–end 1973; and hired during 1972 and employed as of year–end 1975.

The final table in this series, plaintiff's exhibit 33A, table 3, portrays promotions of individuals with 5 to 6 years experience:

| | Remained Non-Management | Promoted To Management | Hired To Management | |
|---|---|---|---|---|
| Males | 7 | 14 | 1 | 22 |
| | 31.8% | 63.6% | 4.5% | 22.9% |
| Females | 74 | 0 | 0 | 74 |
| | 100.0% | 0% | 0% | 77.1% |
| | 81 | 14 | 1 | 96 |
| | 84.4% | 14.6% | 1.0% | 100.0% |

This table included all individuals hired during 1966 and employed as of year–end 1971; hired during 1968 and employed as of year–end 1973; and hired during 1970 and employed as of year–end 1975.

The bank criticized this series of tables because it included such a small percentage of the banks total number of employees during the period between 1970–1975. It is clear, however, that this was an effort to compare promotions of individuals with approximately the same amount of experience. Inasmuch as in a given year only a limited number of employees have the same number of years of experience, the bank's criticism in this regard is invalid.

The Commission also presented a set of regression analyses on the question of promotions to management. In these analyses, the Commission controlled for prior man-

agement experience; educational level; and the initial job placement of the individual. The analyses showed a result that was not statistically significant in terms of sex for individuals with one or two years experience with the bank. The regression analysis for individuals with 3 to 4 years experience, however, indicated a significant difference as a result of sex. The regression analysis for individuals with 5 to 6 years experience also indicated a significant difference in promotions to management as a result of sex.

The Commission buttressed its statistical evidence on the question of promotions with the testimony of present and former female employees of the bank. This testimony supported a finding of discrimination.

Miss Evelyn Fetty was first employed as a teller at the Wallhaven branch of the bank during October 1974. She was a graduate of Kent State University with a degree in elementary education. After having been so employed for about a year she asked the manager of her branch about the availability of promotion opportunities. Her manager instructed her that she should ask Mr. Vander Sluis about such opportunities and, as a result, she met with Mr. Vander Sluis during September, 1975. Mr. Vander Sluis informed her that there was no opportunity for her to advance with the bank and, what's more, if he had been personnel manager at the time of her job application she would not have been employed because she possessed a college degree. Miss Fetty left the bank's employ approximately six months later.

Virginia Kocaj worked as a teller at the bank from January through October of 1974. At that time she possessed a Bachelor of Science degree in mathematics and was working on an under-graduate degree in accounting. Ms. Kocaj was also employed at the Wallhaven branch. She left the bank's employ shortly after a male teller with less time at the bank was promoted to the position of head teller.

Janet Hosick had completed two years of college when she was first employed by the bank as a teller in 1968. After being in that position for approximately four years she inquired of her assistant manager regarding the possibility of a promotion. She was asked if she wanted to be a receptionist but stated she wanted to be an assistant manager. Although she was told that they were "looking into it" downtown, she did not receive a reply to her inquiry and eventually changed to part-time status and, during 1974 left the bank's employ. She was again employed by the bank as a teller during June 1976. At that time she asked Mr. Vander Sluis if the bank had an assistant manager's training program and he replied that it did not. During May of 1977, she became a new account receptionist. She remained in that position for approximately six months and then left the bank's employ.

As noted previously, Sammie Currie was the charging party before the Commission. Between 1966 and 1974, Ms. Currie held many varied positions with the bank. Beginning in January of 1974 she was the new accounts receptionist at the bank's Wilbeth Road branch. That branch did not have an assistant manager prior to September 1974; Mr. Cyrus Thornton was the manager and Mr. Duane French was the head teller.

As also previously stated, Ms. Currie filed her charge with the Commission as a result of Mr. French's promotion to the position of head teller/assistant manager. Ms. Currie and the Commission contend that Mr. French was promoted instead of Ms. Currie because he was a male.

The bank has defended Mr. French's promotion in two ways. First it contends that Ms. Currie was incompetent and secondly it contends that Mr. French had been performing the duties of assistant manager from the time the Wilbeth Road branch opened during January 1974.

The Court notes that although Mr. French was still employed by the bank at the time of trial, he was not called to testify regarding either his alleged voluntary assumption of the duties of assistant manager or his qualifications for that position.

Rather, the bank relied solely upon the testimony of Mr. Thornton in this regard, even though he was absent from the branch during much of the period in question because he was calling on new accounts and because his wife was seriously ill. Although Mr. Thornton repeatedly stated that Mr. French had voluntarily assumed the duties of assistant manager, he was unable to specifically list the duties allegedly so assumed. Accordingly, the Court finds that this assertion was a pretext.

The Court also finds that the assertion that Ms. Currie was incompetent was a pretext. Significantly, the Court notes that Ms. Currie always received very good performance ratings until after she filed her charge with the Commission. In particular, Mr. Thornton completed a favorable evaluation of Ms. Currie's performance on April 9, 1976, prior to his learning of Ms. Currie's charge. Although he testified that he was in no way intimidated by Ms. Currie, a memorandum dated April 16, 1976 of a meeting attended by Mr. Owen, Mr. Thornton, Mr. Kroeger, and Mr. Vander Sluis was, in part, as follows:

Discussion centered on the high rating given to Mrs. Currie on the review form since for several years her performance has not been regarded as anything more than meeting minimum performance requirements.

While it should be pointed out that the office does experience a high level of transactions in the platform positions and it can be evidenced that Mrs. Currie has a pleasant manner with customers although Mr. Thornton does indicate that she does "force herself" at times to be pleasant.

The factor of dependability was marked as very reliable, yet Mr. Thornton indicates that considerable amount of time is spent by him correcting errors and giving instructions.

.    .    .    .    .

It is the opinion of Messrs. Owen, Kroeger and Vander Sluis that Mr. Thornton

used poor judgment in completing the performance review form of Mrs. Currie and was an effort to avoid an uncomfortable position of confronting Mrs. Currie with what can only be described as a below normal work record.

Mr. Thornton's reviews of Ms. Currie's performance have been somewhat lower since the April 16, 1976 meeting. Although he was emphatic in his testimony that he did not know of Ms. Currie's charge on April 9, 1976, it was unclear if he knew of it by April 16, 1976.

The Court finds that the Commission's statistical evidence alone was sufficient to establish a prima facie case of sex discrimination on the issue of promotions to management. That showing is bolstered by the testimony of the individual female employees. The burden, therefore shifted to the bank to "articulate" a non–discriminatory reason for its failure to promote women. The bank presented a number of tables in its attempt to carry this burden.

One of the tables presented by the bank in this regard dealt with merit upgrades. As stated in the bank's brief:

One indicia of the promotability of an employee is the frequency with which he or she receives merit upgrades. Merit upgrades are defined as increases in pay which were not across–the–board salary increases given to every employee; in other words, the salary increase that was merited by a particular person's service is considered a merit upgrade. Defendant's exhibits indicate that females received at least their share of merit upgrades throughout the relevant time period.

Accepting the bank's premise (about which there is some doubt since there was evidence that the only real issue about merit upgrades was the amount of the increase rather than the frequency), this argument does not assist it in carrying its burden. The bank's task is to show that females were not promoted because they lacked qualifications. If females received at least their share of merit upgrades and if that is

an indication of promotability, it is unclear why they remained in the lowest positions at the bank.

The bank also attempted to meet its burden by evaluating promotions in a manner that it referred to as a job–pool analysis. That is, the bank claimed women were not promoted into management and officer positions because they were not in the positions that made up the pool from which managers and officers were pulled.

There are at least two problems with this analysis. First, as found previously, the bank has engaged in a pattern and practice of sex discrimination in initial job assignments. Since December 25, 1973, therefore, the lack of females in the so–called management pool can be attributed in part to illegal sex discrimination.[3]

The other problem with this analysis is the manner in which the bank determined what positions make up its job pool. It was not based upon an evaluation of the qualities developed by the performance of the duties in a particular position that led to its inclusion in the management job pool. Rather, it was the fact that someone was promoted from a position to a management or officer position that led to that inclusion. As found previously, a large number of jobs at the bank were held exclusively by members of one sex. If one of the individuals holding a position in an all male job was promoted to a management position, that job automatically became part of the management job pool. Accordingly, to the extent that the bank promoted males instead of females because of their sex, this type of analysis would make it appear that there were less females available for promotion. That is, the more the bank's promotion decisions were based upon sex rather than qualifications, the less women would show up in the so–called management job pool. The Court finds the bank's job analysis a pretext.

The final argument relied upon by the bank was in the form of a table, defendant's exhibit C–45, that purported to evaluate promotions based upon qualities that the bank contended affected promotability. Those qualities were as follows: (1) seniority at the beginning of period; (2) business degree; (3) other degree; (4) absenteeism (if more than 8 percent); (5) part–time within two years prior to period. This analysis found that there was a significant disparity based upon sex during the period 1973–1974, but not during other years. The Court finds this analysis insufficient to carry the bank's burden for those other years because of the variables the bank included in its regression. For instance, there was evidence that the only position at the bank in which part–time work was available was the position of teller. Inasmuch as a large percentage of tellers employed by the bank were females, the failure to promote individuals who had previously worked part–time could have as readily been a result of their sex, not the fact that they had previously worked part–time. The variable of absenteeism may also have had a built in sexual impact. The bank presented evidence that on the average its female employees· missed more days of work than did its male employees. The Court is concerned that inasmuch as the bank's female employees were assigned to lower level positions, the absentee records for those positions may have been recorded more accurately than for higher positions. In addition, although the Commission's claim is only in regard to promotions to management, defendant's exhibit C–45 included all promotions. Promotions of males into management positions would show up

---

**3.** If the bank's job–pool analysis were otherwise valid, that is if it were based on evidence that holding a position in the job–pool was a bona-fide qualification for promotion to management, the fact that women hired prior to December 25, 1973 were foreclosed from those positions by sex discrimination would be irrele- vant. Inasmuch as such placement was not the subject of a timely charge, "it is merely an unfortunate event in history which has no present legal consequences." *United Airlines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

the same on defendant's table as would promotions of females from one non–management position to another.

Accordingly, the Court finds that the contentions put forth by the bank to rebut the Commission's prima facie case on this issue were pretexts. The bank's failure to provide its female employees with equal opportunity for promotions into management and officer positions, therefore, require the imposition of liability in this case.

## VI.

Based on the foregoing, the Court concludes that the bank has engaged in a pattern and practice of sex discrimination by engaging in job assignment practices that have an adverse effect upon women and by failing to promote women into management and officer positions because of their sex. The Court further concludes that Ms. Sammie Currie was denied a promotion to the position of head teller/assistant manager on September 6, 1974 because of her sex.[4] The bank is hereby directed to submit on or before June 23, 1980 a plan to remedy the violations found. The Court expects that before submitting its plan to the Court the bank will confer with the Commission and Ms. Currie. The Commission and Ms. Currie shall file their response to the bank's plan on or before July 10, 1980.

IT IS SO ORDERED.

---

4. Ms. Currie failed to present evidence on her other individual allegations.